Filed 4/19/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ANTHONY TAYLOR,<br><br>        on Habeas Corpus. | A155328<br><br>(Alameda County<br>Super. Ct. No. H17262A) |

Petitioner Anthony Taylor participated in an attempted robbery at a Livermore liquor store during which one of his accomplices shot to death a store employee, 70-year-old Kathryn Cary.  In 1994, a jury convicted Taylor of first degree felony murder and found that the killing occurred in the commission of an attempted robbery that he aided and abetted "as a major participant" and "with reckless indifference to human life," a special circumstance requiring a sentence of life in prison without the possibility of parole under Penal Code section 190.2, subdivision (d) (section 190.2(d)).[1]

In 2018, Taylor filed the instant petition for a writ of habeas corpus seeking to have the special circumstance vacated under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which clarified "what it means for an aiding and abetting defendant to be a 'major participant' who acted with a 'reckless indifference to human life.' " (*In re Miller* (2017) 14 Cal.App.5th 960, 964 (*Miller*).)  Under this authority, a defendant acts with a reckless indifference to human life when he or she "knowingly creat[es] a 'grave risk of death.' " (*Banks*, at p. 808.) We hold that evidence of a defendant's actions *after* a murder betraying an indifference to the loss of life does not, standing alone, establish that the defendant knowingly created

---

[1] All further statutory references are to the Penal Code.

a grave risk of death.  Because there is no other evidence that Taylor had such an intent when he participated in the attempted robbery, we grant his petition to vacate the special circumstance.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

The following facts about the murder are taken from this court's unpublished opinion in Taylor's direct appeal, *People v. Davis* (Mar. 14, 1996, A065553).

"On the night of May 15, 1991, 70-year-old Kathryn Cary was shot and killed as she was making a night deposit of the receipts of the liquor store where she was employed.  There was evidence that Marzett Davis, Anthony Taylor, Tyree Shackelfoot[,] and Theodore Lawless had planned to rob the store's receipts, and that Davis attempted the robbery and shot Cary while the other men waited in a car driven by Taylor. . . .

"At least one week before the crimes, Taylor and Shackelfoot were in the parking lot of Ernie's Liquor Store watching Ernie, an employee, walk with the store's receipts to a nearby bank.  They discussed the fact that Ernie's did not seem to be taking any precautions to prevent theft of the receipts.  On May 14, Taylor drove to Shackelfoot's house.  Davis, with Lawless in the car, drove by.  Taylor flagged Davis to follow him.  They then drove to Ernie's.  Davis joined Taylor and Shackelfoot in their car, where they told him about the lack of security at the liquor store.  They planned a robbery, deciding where they would park the car, where the person who was to take the money would stand, and how they could get away after the robbery.  They at first planned to commit the robbery over the weekend, but when they realized that the liquor store's take for May 15 would be swollen by Lotto receipts, they decided to commit the offense on that date.  The plan was that Davis would grab the sack of receipts as a store employee was depositing it in a bank night[-]deposit box.  He would then run to the car where the others were waiting, and they would make their escape.  On the night of May 15 the men met at Taylor's apartment.  Everyone but Davis got into Taylor's car.  Davis went to his own

2

car, opened the hood[,] and took out a gun, which he put in his waistband. He then got into Taylor's car. Davis was dressed all in black. With Taylor driving, they drove to Ernie's, parking on the street as planned. Davis got out of the car and moved to the corner of the bank building. After a[]while Davis returned to the car, saying they must have missed the deposit. Taylor told him to wait a little longer, and Davis returned to his post. About five or ten minutes later the men in the car saw Davis run in the direction of the bank. The others' view of the robbery was blocked by a corner of the building, but they heard gunshots, and heard a woman say, '[Y]ou shot me.' Davis ran back to the car but Taylor, noticing that a tan car or van had appeared, told Davis to keep going. The tan car attempted to follow Davis, but he jumped through some bushes and disappeared. The tan car went back to the parking lot where the victim lay. Taylor then started his car and picked up Davis. The man who drove the tan car testified that he noticed a man and a woman fighting over something. He heard three shots and saw a flash after which the woman dropped to the ground. The man ran away and the witness attempted to follow. When he was unable to do so he returned, finding the woman lying in a pool of blood. The victim was Kathryn Cary, an employee of Ernie's [L]iquors. She died approximately one-half hour later. The store's deposits were in a bag that was discovered in the open night[-]deposit drawer. On the following day, Shackelfoot asked Taylor what they should do. Taylor responded, 'Fuck that old bitch,' telling Shackelfoot to keep quiet about the incident because they would be just as guilty as Davis. Davis testified [on] his own behalf. He admitted that he and Taylor planned an armed robbery, and that he had armed himself with a .380 on the night in question. Before he was able to commit the robbery, however, he heard voices and saw a man and a woman struggling. He saw the man swing at the woman, after which he heard two shots, and ran away."

The jury found Taylor guilty of first degree murder as an aider and abettor of Davis in the attempted robbery and found true the allegation that Taylor or a principal was armed during the offense and aided and abetted the robbery as a major participant and with reckless indifference to human life. The jury also convicted Taylor of attempted

3

robbery and found true that he or a principal was armed during the offense.[2] He was sentenced to life without the possibility of parole for the murder, plus a one-year term for the arming enhancement, and an 18-month sentence for the attempted robbery was imposed and stayed.

Taylor appealed, and this division affirmed the judgment in its 1996 unpublished opinion. Among other claims, he argued that insufficient evidence supported the special circumstance. The opinion rejected the claim as follows:

"Taylor argues that he was not a 'major participant' because he was not present at the time of the killing, was unarmed, and was assigned the role of driving the getaway car. Taylor erroneously focuses on the question of whether he was a major participant in the *killing*. The correct focus is whether he was a major participant in the underlying *felony*; i.e., here, the robbery. Although Taylor likes to paint himself as little more than a bystander who sat quietly in the car with no idea of what Davis was doing, there was significant evidence that Taylor conceived of the idea of committing the robbery, planned it, and solicited Davis to participate in it. It also appeared that Taylor was the decision-maker. Thus, when Davis returned to the car on the assumption that the receipts already had been deposited, Taylor directed him to return to the selected place. In addition, after the crime, Taylor wouldn't let Davis back in the car, telling him to keep going and picking him up only later. The evidence therefore discloses that Taylor was a major participant in the robbery.

"Taylor also argues that the evidence does not support the argument that he acted with reckless indifference to human life. The court in *Tison v. Arizona* (1987) 481 U.S. 137 [(*Tison*)] . . . described the requisite mental state as follows: 'the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a

---

[2] This division's prior opinion states that the jury found Taylor "was armed" during the crimes. The arming enhancements were imposed under section 12022, subdivision (a)(1), which applies to aiders and abettors who were not personally armed with a firearm, and no evidence was presented that Taylor himself had a weapon that night.

grave risk of death.' [Citation.] The court in the recent case of *People v. Estrada* (1995) 11 Cal.4th 568 explained that the phrase ' "reckless indifference to human life" ' means that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death. [Citation.] Here, there was evidence that Taylor planned the crime, and in order to implement it recruited Davis, a man he knew to have a fondness for weapons. A reasonable inference is that Taylor selected Davis in part because he expected that violence might be necessary. After the violence did in fact occur, Taylor, who, as the driver and the person in charge could have come to the victim's aid, simply drove off, later stating[,] 'Fuck that old bitch.' The evidence, accordingly, supports a finding that Taylor had a subjective appreciation that his participation in the crime involved a grave risk of death and that he was not just recklessly indifferent to that risk, but callously indifferent. The findings that both prongs of the special circumstances allegation were present, therefore, were supported by the evidence."

Ten years later, in July 2016, Taylor filed a petition for a writ of habeas corpus in the superior court, claiming that the special circumstance could not stand under the Supreme Court's 2015 decision in *Banks*. After the superior court denied the petition, Taylor petitioned for habeas relief in this court, again relying on *Banks*. We summarily denied the petition in June 2017. (*In re Taylor* (Jun. 15, 2017, A151364).)

Taylor then filed a petition for a writ of habeas corpus in our state Supreme Court raising the same issue. In September 2018, the Supreme Court issued an order to show cause "why petitioner is not entitled [to] relief under [*Banks*]."[3] The case was transferred to this court, and we ordered counsel appointed for Taylor. After the Attorney General

---

[3] Because the Supreme Court limited its order to show cause to the *Banks* issue, we do not address the other claims Taylor raised in the instant habeas petition. We note that the Court recently granted review in a case that also involves whether substantial evidence supported a robbery-murder special circumstance. (*In re Scoggins*, Dec. 17, 2018, C084358 [nonpub. opn.], review granted Apr. 10, 2019, S253155.)

filed a return, Taylor filed a traverse.  Taylor also filed a request for judicial notice of the clerk's and reporter's transcripts from his trial, which we granted.

## II.
### DISCUSSION

A.    *The Felony-murder Special Circumstance.*

Murder "committed in the perpetration of, or attempt to perpetrate, . . . robbery . . . is murder of the first degree."  (Former § 189, now § 189, subd. (a).)  At the time of Cary's murder, a defendant could be found guilty of felony murder under this statute as an aider and abettor so long as he or she had "the specific intent to commit the underlying felony" and, in furtherance of that intent, committed acts from which death resulted.  (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1011 (*Bennett*).)  In other words, an aider and abettor of the underlying felony was held " 'strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony.' "[4]  (*Clark*, *supra*, 63 Cal.4th at p. 615.)

Until 1990, "state law made only those felony-murder aiders and abettors who intended to kill eligible for a death sentence."  (*Banks*, *supra*, 61 Cal.4th at p. 798.)  That year, the voters passed Proposition 115, which made eligible for death "every person, not the actual killer, who, with reckless indifference to human life and as a major participant," aids and abets a specified felony, including robbery, that "results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, . . . if a[n enumerated] special circumstance . . . has been found to be true."  (§ 190.2(d); *Banks*, at p. 794; see § 190.2, subd. (a)(17).)  Among those special circumstances is participation in a robbery murder.  (§ 190.2, subd. (a)(17)(A); *Miller*,

_____

[4] Recently, the Legislature passed Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill No. 1437), which restricted the circumstances under which a defendant may be found guilty of felony murder.  Effective January 1, 2019, a participant in the underlying felony that results in death is "liable for murder" only if he or she (1) was the actual killer, (2) with intent to kill, aided and abetted the actual killer in committing first degree murder, or (3) "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in [section 190.2(d)]."  (§ 189, subd. (e).)  We discuss this legislation's relevance to Taylor's case in section II.E. below.

*supra*, 14 Cal.App.5th at p. 967.) That a murder was committed during another felony under section 189, however, is "insufficient of itself to establish a felony-murder special circumstance" under section 190.2(d). (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393 (*Ramirez*).) Rather, a defendant who, like Taylor, "aided and abetted the underlying felony but was not the actual killer" and did not have an intent to kill "must aid and abet the commission of the felony 'with reckless indifference to human life and as a major participant' " for the special circumstance to be imposed. (*Ibid.*, quoting § 190.2(d).)

      B.      Banks*, Clark, *and the* Tison-Enmund *Continuum.*

As our state Supreme Court observed in *Banks*, "[s]ection 190.2(d) was designed to codify the [United States Supreme Court's] holding [in] *Tison* . . . , which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 [(*Enmund*)], collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, *supra*, 61 Cal.4th at p. 794.) *Banks* concluded that section 190.2(d) "must be accorded the same meaning" as the principle discussed in *Tison* and *Enmund* and "must be given the same interpretation irrespective of whether the defendant is subsequently sentenced to death or life imprisonment without parole." (*Banks*, at p. 794.) In other words, although *Tison* and *Enmund* addressed only the Eighth Amendment's limitations on the death penalty, those decisions also govern the interpretation of section 190.2(d) under state law. (See *Banks*, at p. 804.)

Beginning with the principle that "in capital cases above all, punishment must accord with individual culpability," *Banks* explained that the death penalty cannot be imposed based solely on a defendant's "vicarious responsibility for the underlying crime." (*Banks*, *supra*, 61 Cal.4th at p. 801.) Rather, to be sentenced to death, a defendant must, compared to "an ordinary aider and abettor to an ordinary felony murder," have both a more culpable mind state—reckless indifference to the risk of death—and more substantial involvement—as a major participant. (*Id.* at pp. 801-802.)

7

Because the United States Supreme Court had "found it unnecessary to 'precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty,' " *Banks* concluded that "a jury presented with this question must consider the totality of the circumstances." (*Banks*, at pp. 801-802, quoting *Tison*, *supra*, 481 U.S. at p. 158.) Accordingly, *Banks* closely examined the facts in *Enmund* and *Tison* "[t]o gain a deeper understanding of the governing test and offer further guidance." (*Banks*, at p. 801.)

In *Enmund*, the defendant learned that a man "was in the habit of carrying large sums of cash on his person. A few weeks later, [the defendant] drove two armed confederates to [the man's] house and waited nearby while they entered. When [the man's] wife appeared with a gun, the confederates shot and killed [the couple]. [The defendant] thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found." (*Banks*, *supra*, 61 Cal.4th at p. 799.) The United States Supreme Court reversed the death sentence, concluding that the Eighth Amendment barred such punishment "for any felony-murder aider and abettor 'who does not himself [or herself] kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' " (*Ibid.*)

In *Tison*, the defendants "helped plan and carry out the escape of two convicted murderers from prison," one of whom had killed a guard during a previous escape. (*Banks*, *supra*, 61 Cal.4th at p. 802.) "This entailed [the defendants'] bringing a cache of weapons to prison, arming both murderers, and holding at gunpoint guards and visitors alike." (*Ibid.*) During the escape, the defendants robbed and held at gunpoint an innocent family "while the two murderers deliberated whether the family should live or die," and the defendants "then stood by" while the murderers shot all four family members. (*Ibid.*) The United States Supreme Court affirmed the death sentences, holding that " 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.' " (*Id.* at p. 800.)

8

Comparing the facts in *Enmund* with those in *Tison*, *Banks* derived a nonexclusive list of factors bearing on whether an aider and abettor of felony murder was a "major participant" under section 190.2(d): " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?' " (*Clark*, *supra*, 63 Cal.4th at p. 611, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.)

Applying these factors, *Banks* held there was insufficient evidence that the defendant in the case before it was a major participant in the underlying robbery.  (*Banks*, *supra*, 61 Cal.4th at p. 805.)  The evidence showed that the defendant had "dropped his confederates off near [a marijuana] dispensary" and "waited three blocks away for approximately 45 minutes."  (*Id.* at pp. 795, 805.)  After a security guard attempted to stop the robbers, all of whom were armed, one of them shot and killed him.  (*Id.* at p. 795.)  The defendant then headed toward the dispensary, picked up the other two non-shooters, and drove them away.  (*Id.* at pp. 795-796, 805.)  Our state Supreme Court concluded that the defendant was "at the *Enmund* pole of the *Tison-Enmund* spectrum," as there was no evidence that he planned the robbery or procured weapons, knew the shooter had previously committed a violent crime, or was present at the scene or even aware that a shooting had occurred.  (*Id.* at p. 805.)  The Court also concluded that the defendant had not exhibited reckless indifference to human life, emphasizing that a defendant's knowing participation in an armed robbery and subjective awareness of "the risk of death inherent in [that crime]" does not suffice.  (*Id.* at pp. 807-808.)  Rather, a defendant must appreciate that his or her "own actions would involve a grave risk of death."  (*Id.* at p. 807.)

*Clark* expounded on the meaning of the "reckless indifference to human life" element of a special circumstance under section 190.2(d), which " 'significantly

overlap[s]' " with the "major participant" element.  (*Clark*, *supra*, 63 Cal.4th at pp. 614-615; *Bennett*, *supra*, 26 Cal.App.5th at p. 1015.)  *Clark* explained that the mind state "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his [or her] actions." (*Clark*, at pp. 616-617.)  The required intent has "both subjective and objective elements.  The subjective element is the defendant's conscious disregard of risks known to him or her.  But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities.  Rather, recklessness is also determined by . . . what 'a law-abiding person would observe in the actor's situation.' " (*Id.* at p. 617.)  As *Banks* did as to the "major participant" element, *Clark* provided a nonexclusive list of factors bearing on the "reckless indifference to human life" element.  (*Clark*, at p. 618.)  These factors are the "defendant's knowledge of weapons used in the crime, and their actual use and number; [the] defendant's proximity to the crime and opportunity to stop the killing or aid [the victim or victims]; the duration of the crime; [the] defendant's knowledge of [the actual killer's] propensity to kill; and [the] defendant's efforts to minimize the possibility of violence during the crime." (*Miller*, *supra*, 14 Cal.App.5th at p. 975; see *Clark*, at pp. 618-621.)

Applying these factors to the facts, *Clark* concluded there was insufficient evidence that the defendant had acted with reckless indifference to human life.  (*Clark*, *supra*, 63 Cal.4th at p. 623.)  As summarized by a later decision, the *Clark* defendant " 'was the mastermind who planned and organized [an] attempted robbery [of a computer store] and who was orchestrating the events at the scene of the crime.' [Citation.] During the robbery, one of [the defendant's] accomplices . . . shot and killed the mother of a store employee who arrived at the store to pick up her son.  At the time of the shooting, [the defendant] was not at the store, but he drove to the location shortly thereafter and fled when he saw a woman lying on the ground, the police approaching, and [the shooter] fleeing the scene." (*Bennett*, *supra*, 26 Cal.App.5th at pp. 1014-1015, quoting *Clark*, at p. 612.)  Despite the evidence of the defendant's significant involvement in planning the robbery, there was also evidence that he "planned the crime

10

with an eye to minimizing the possibilities for violence," because it was timed for after the store closed and there were not supposed to be bullets in the gun.  (*Clark*, at pp. 621-623.)  The Court concluded that the special circumstance had to be vacated since "nothing in the plan . . . elevated the risk to human life beyond those risks inherent in any robbery."  (*Id.* at p. 622.)

### C.    *Taylor's Claim Is Not Procedurally Barred.*

Before reaching the merits of Taylor's claim, we address the Attorney General's contentions that it is procedurally barred because (1) it was raised and rejected on appeal; (2) substantial-evidence claims are not cognizable in habeas proceedings; and (3) the petition is untimely.  We do so "out of an abundance of caution," as "[w]ere there a valid procedural bar, we would have expected [our state] Supreme Court to deny the petition rather than issuing an order to show cause returnable before this court."  (*Ramirez*, *supra*, 32 Cal.App.5th at p. 406, fn. 11.)

The Attorney General begins by invoking the same two procedural rules that he relied on in *Miller* and *Ramirez*.  (*Ramirez*, *supra*, 32 Cal.App.5th at pp. 407-408; *Miller*, *supra*, 14 Cal.App.5th at pp. 977-979.)  First, under *In re Waltreus* (1965) 62 Cal.2d 218 (*Waltreus*), " 'legal claims that have previously been raised and rejected on direct appeal ordinarily cannot be reraised in a collateral attack by filing a petition for a writ of habeas corpus.' "  (*Miller*, at p. 978.)  And second, under *In re Lindley* (1947) 29 Cal.2d 709 (*Lindley*), " 'routine claims that the evidence presented at trial was insufficient' " cannot be raised in a habeas petition.  (*Miller*, at p. 979.)

In concluding these rules did not bar the petitioner's claim in *Miller*, the Second District Court of Appeal "beg[a]n with an overarching, dispositive point:  Federal due process guarantees require reversal of [a] special circumstance finding [that is not supported by substantial evidence] regardless of the Attorney General's California-law-based procedural arguments."  (*Miller*, *supra*, 14 Cal.App.5th at p. 977; accord *Ramirez*, *supra*, 32 Cal.App.5th at pp. 406-407.)  As *Miller* explained, in *Fiore v. White* (2001) 531 U.S. 225 (*Fiore*), the United States Supreme Court held that where, as here, a state high court's decision " ' "did not announce a new rule of law" ' but rather ' "merely

11

clarified the plain language of the statute," ' " the Due Process Clause of the Fourteenth Amendment forbids the state from convicting a defendant " 'for conduct that its criminal statute, as properly interpreted, does not prohibit.' " (*Miller*, at pp. 977-978, quoting *Fiore*, at p. 228; accord *Ramirez, supra*, 32 Cal.App.5th at pp. 406-408.) And although the federal Constitution therefore required overturning the special circumstance, regardless of the California habeas procedural requirements relied on by the Attorney General, *Miller* went further and concluded that those requirements "in fact stand[] in harmony with federal due process principles." (*Miller*, at p. 978.)

In urging us not to follow *Miller* (and by extension, *Ramirez*), the Attorney General ignores *Miller*'s conclusion that a special circumstance that lacks substantial evidence cannot stand under *Fiore*. Instead, he claims that *Miller*'s reasoning "cannot be squared with *Waltreus* or *Lindley*." We fully agree with *Miller*'s explanation of why, even apart from federal law, these rules do not bar claims such as Taylor's, and we find it unnecessary to reiterate that reasoning here. (*Miller, supra*, 14 Cal.App.5th at p. 978; accord *Ramirez, supra*, 32 Cal.App.5th at p. 408.)

The Attorney General also raises a potential procedural bar not considered in either *Miller* or *Ramirez*: that the petition is untimely because of Taylor's "[u]njustified delay" in bringing it.[5] "A criminal defendant mounting a collateral attack on a final judgment of conviction must do so in a timely manner. 'It has long been required that a petitioner explain and justify any significant delay in seeking habeas corpus relief.' " (*In re Reno* (2012) 55 Cal.4th 428, 459.) In determining whether a petition is timely, the basic issue is whether it was " ' "filed as promptly as the circumstances allow." ' " (*Id.* at p. 460.)

---

[5] The Attorney General devotes several pages of his briefing to discussing the " 'new rule of law' exception to the timeliness rule articulated in *Harris*." (Citing *In re Harris* (1993) 5 Cal.4th 813, 841.) In fact, this exception is to the *Waltreus* rule, not to the timeliness requirement, and we agree with the Attorney General that the exception does not apply here.

12

The Attorney General suggests that the petition was brought after substantial delay because it was "filed over 20 years after the finality of direct review." But substantial delay is " ' "measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim." ' " (*In re Reno*, *supra*, 55 Cal.4th at p. 460.) *Banks* and *Clark* significantly affected the interpretation of section 190.2(d), and we conclude that any delay can be measured only from the dates of those decisions, not the disposition of Taylor's substantial-evidence claim on direct appeal. *Banks* was decided on July 9, 2015, and became final when the time for petitioning for a writ of certiorari in the United States Supreme Court expired, on October 7, 2015. (See *In re Lucero* (2011) 200 Cal.App.4th 38, 44; 28 U.S.C. § 2101(b); U.S. Supreme Ct. Rules, rules 13(1), (3).) *Clark* was decided on June 27, 2016, and four days later Taylor filed his first habeas petition in the superior court. Even putting aside *Clark*, we cannot say that Taylor's filing of a petition less than a year after *Banks* became final constituted a substantial delay. (See, e.g., *Lucero*, at pp. 44-45 [no substantial delay where petition based on new state Supreme Court authority filed 10 months after decision became final].)

In short, we conclude that Taylor's claim is not barred by California habeas procedural rules, and we turn to address it on the merits.

  D.  *Substantial Evidence Does Not Support the Conclusion that Taylor Acted with Reckless Indifference to Human Life.*

    1.  The scope of our review.

"In a habeas corpus challenge to the sufficiency of the evidence to support a special circumstance finding, the 'standard of review . . . is whether, when evidence that is reasonable, credible, and of solid value is viewed "in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." . . . We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial.' " (*Bennett*, *supra*, 6 Cal.App.5th at p. 1018.)

13

Initially, we address the proper role of the judicially noticed documents from the record in Taylor's direct appeal, which consist of the clerk's and reporter's transcripts. Taylor cited these documents for the first time in his briefing in support of the traverse, and he filed his request for judicial notice a couple weeks after filing the traverse. In his traverse briefing, he states that although he "agrees that this Court's statement of the evidence [in the opinion in his direct appeal] is generally accurate, it was composed without the benefit of" *Banks* and *Clark*, and he indicates that he has "include[d] in his argument additional facts from the trial record which bear on the specific factors the Supreme Court set forth in those cases." According to Taylor, these additional facts suggest that he did not know that Davis had a gun, intended the robbery to be an unarmed snatch-and-grab, and may have been unable to help Cary any sooner than she already was by others. The Attorney General confined his analysis to the facts from the previous opinion, and he did not have the opportunity to respond to Taylor's reliance on the additional facts derived from the direct appeal's record.

It is nonetheless appropriate for us to consider the judicially noticed documents because our task is to independently review the record to determine if the special circumstance is supported by substantial evidence. While our review relies heavily on the factual discussion in Taylor's direct appeal, it also considers other germane parts of the record. (See *Bennett*, *supra*, 26 Cal.App.5th at p. 1007, fn. 2 ["provid[ing] additional factual background from [petitioner's] exhibits where necessary"]; see also *Miller*, *supra*, 14 Cal.App.5th at pp. 964-966 [not relying on factual summary from opinion on direct appeal].)

2. Insufficient evidence supports the special circumstance.

Applying the *Clark* factors, we conclude that Taylor falls closer to the *Enmund* end of the spectrum and that substantial evidence does not support the determination that he acted with reckless indifference to human life. (See *Clark*, *supra*, 63 Cal.4th at p. 615; *Miller*, *supra*, 14 Cal.App.5th at p. 974 & fn. 4.) As a result, we need not decide whether substantial evidence supports the determination that Taylor was a major participant in the attempted robbery. (See *Clark*, at p. 614; *Miller*, at pp. 974-975.)

14

We start with the general proposition that "felony murderers . . . who simply had awareness their confederates were armed and armed robberies carried a risk of death . . . lack the requisite reckless indifference to human life" because "only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks*, *supra*, 61 Cal.4th at pp. 808-809.) Thus, where, as here, a defendant's "culpability for [the] murder resides in his [or her] role as planner and organizer, or as the one who set the crime in motion, rather than in his [or her] actions on the ground in the immediate events leading up to [the] murder," the plan must have some aspect "that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.)

Here, Taylor did not supply Davis with the murder weapon, and the evidence was inconclusive as to whether Taylor knew Davis had a gun that night. The jury could have reasonably inferred that Taylor was aware Davis had ready access to guns, but it was unclear whether Taylor actually saw Davis retrieve the weapon. While the previous opinion referred to Davis's testimony "that he and Taylor planned an armed robbery," that testimony established only that *Davis* planned an armed robbery. Davis testified that he brought the gun intending only to scare the victim, but there was no evidence he and Taylor talked beforehand about the use of a gun. Nor did Taylor have or use his own weapon during the crime. Thus, even assuming there was substantial evidence that Taylor knew Davis was armed, there is little about Taylor's use or knowledge of firearms that suggests he appreciated the planned robbery posed a heightened risk of death.

In addition, and as was true of the *Banks* petitioner, "nothing in the record reflects that [Taylor] knew there would be a likelihood of resistance and the need to meet that resistance with lethal force." (*Banks*, *supra*, 61 Cal.4th at p. 811.) The evidence showed that Taylor and the other men planned for Davis to quickly grab the money from a lone employee late at night after the liquor store had closed, reducing the risk of violence. (See *Clark*, *supra*, 63 Cal.4th at p. 622 ["a defendant's apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis"].)

Moreover, the planned duration of the snatch-and-grab robbery was short. Although Davis had to wait some time for Cary to emerge from the store, nothing about

15

his actions while doing so would have indicated to Taylor that he might become violent. (See *Clark*, *supra*, 63 Cal.4th at p. 621.) And once Davis confronted Cary, the struggle and ensuing shooting happened almost immediately. Thus, as in other decisions overturning special circumstances, including *Banks* and *Clark*, the evidence tended to show that the shooting was a "somewhat impulsive" response to the victim's unexpected resistance, as opposed to the culmination of a prolonged interaction that increased the opportunity for violence. (*Miller*, *supra*, 14 Cal.App.5th at p. 975; see *Clark*, at p. 539; *Banks*, *supra*, 61 Cal.4th at pp. 795, 805; *Ramirez*, *supra*, 32 Cal.App.5th at p. 404; compare *Tison*, *supra*, 481 U.S. at pp. 151-152; *Clark*, at p. 620 [discussing *Tison*].)

Nor was there any evidence that Davis had killed before or that Taylor was aware of previous violent behavior on Davis's part. (See *Clark*, *supra*, 63 Cal.4th at p. 621; *Banks*, *supra*, 61 Cal.4th at pp. 810-811; *Miller*, *supra*, 14 Cal.App.5th at p. 976.) The two men were good friends, and Taylor was likely aware of Davis's involvement in various illegal activity, including drug sales, but other decisions have refused to attribute significance to prior criminal activity that did not involve *deadly* violence. (*Banks*, at p. 810-811 [defendant member of same gang as killer, but no evidence they "ever participated in shootings, murder, or attempted murder"]; *Ramirez*, *supra*, 32 Cal.App.5th at p. 405 [petitioner's knowledge that shooter was gang member and "had a history of delinquency" did not support inference that petitioner could expect shooter would use deadly force]; *Miller*, at p. 976 [insufficient that defendant and killer were in same gang and had committed other robberies together].)

Taylor's physical position during the crime also weighs in his favor. Although Taylor was parked on the street near where the killing occurred, he never got out of the car and had no opportunity to prevent the shooting. Indeed, it appears that Taylor could not even see Davis's interaction with Cary. Rather, Taylor's primary role was to be the getaway driver, and he had no direct involvement in the shooting. In this respect, his actions were more akin to those of offenders in cases overturning special circumstances. (See, e.g., *Clark*, *supra*, 63 Cal.4th at pp. 620-621 [defendant who was in store parking lot did not direct shooter to use lethal force or have chance to intervene]; *Ramirez*, *supra*,

16

32 Cal.App.5th at pp. 404-405 [petitioner may have been able to see and hear what was happening, but was not "close enough to exercise a restraining effect on the crime or his colleagues"]; compare, e.g., *Tison*, *supra*, 481 U.S. at pp. 140, 158 [petitioners "actively involved in every element of the kidnaping-robbery and physically present during the entire sequence of criminal activity," including when killer voiced intention to kill]; *In re Loza* (2017) 10 Cal.App.5th 38, 51, 53 [petitioner who was also in store where killing occurred had "time to observe and react before the murder" because he heard killer threaten to shoot store clerk and count to five before doing so].)

The evidence most unfavorable to Taylor was of his actions *after* the shooting. In rejecting Taylor's previous challenges to the special circumstance, both this division and the superior court relied heavily on these actions to conclude that, under the law as it was then understood, there was substantial evidence of the required mens rea. But as we explain, given the lack of evidence that Taylor planned anything more dangerous than "a garden-variety armed robbery" (*Banks*, *supra*, 61 Cal.4th at p. 802), his behavior after the fact revealing an indifference to Cary's death, while reprehensible, does not show he acted with reckless disregard to the risk to human life posed by the planned robbery.

First, both the superior court and this division emphasized that Taylor made no attempt to help Cary after he knew she was shot, instead helping Davis to flee the scene. But there is no evidence that Taylor appreciated how badly Cary was wounded. (See *Bennett*, *supra*, 26 Cal.App.5th at p. 1026 [petitioner's flight "[did] not support an inference [he] necessarily understood a killing had occurred"].) And it appears Taylor knew help was arriving: He told Davis not to get in the car when he saw another vehicle, and he did not drive away with Davis until after that vehicle headed toward Cary's location. In fact, help reached her almost immediately, and there was no evidence that she might have survived had Taylor acted differently. (See *Clark*, *supra*, 63 Cal.4th at p. 620.)

Second, both courts also focused on testimony by Shackelfoot that when he asked Taylor the following day what they should do, Taylor said, "Fuck that old bitch," and advised Shackelfoot not to tell anyone what had happened. This division's prior opinion

17

suggested that this comment was evidence that Taylor was not just "recklessly indifferent" to human life, "but callously indifferent." The superior court similarly remarked that the comment exemplified a "callous indifference to human life."

We agree that the remark was abhorrent, but the governing standard as explained in *Banks* and *Clark* is not satisfied with evidence of a general indifference to human life, but instead with evidence of a *reckless* indifference, which is shown when the defendant knowingly *creates* a serious *risk* of death. (*Banks*, *supra*, 61 Cal.4th at pp. 808-809.) Thus, even if a defendant is unconcerned that a planned felony resulted in death, as Taylor was, there must also be evidence that the defendant's participation in planning or carrying out the crime contributed to a heightened risk to human life. While Taylor's behavior after the murder may be relevant to whether he acted with the requisite mind state, under *Banks* and *Clark* it is insufficient, standing alone, to constitute substantial evidence that he acted with reckless indifference to human life in participating in the attempted robbery.

The Attorney General offers little independent argument resisting this conclusion. Instead, he primarily rests on the reasoning of the prior appellate opinion and the superior court's order. As we have said, both decisions focused on Taylor's actions after the murder in concluding that he acted with reckless indifference to human life, but those actions are insufficient in and of themselves to establish the required mens rea. The previous opinion also determined it was reasonable to infer that Taylor "recruited Davis, a man he knew to have a fondness for weapons, . . . in part because he expected that violence might be necessary." But the direct appeal was decided before *Banks* and *Clark*, which make clear that the planning of an armed robbery, which always carries some risk of violence, is not enough.

In its order, the superior court relied heavily on *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, affd. on other grounds (2018) 5 Cal.5th 186, an opinion it characterized as "illustrat[ing] why there was sufficient evidence that [Taylor] acted with reckless indifference to human life." But in analogizing *Gonzalez* to this case, the superior court discussed only Taylor's actions after the shooting. True enough, the

18

*Gonzalez* defendant also demonstrated an indifference to human life after the shooting that took place in that case. After a shot was fired, she did not call for help or attempt to assist the victim, and she instead "spent the afternoon with the shooter." (*Gonzalez*, at p. 1385.) But her actions before the murder also demonstrated her indifference. Namely, she came up with the idea to rob the victim, her ex-boyfriend, and she told her co-defendants that he "was a drug dealer who had been physically violent in the past. Thus, unlike in *Banks*, there was a substantial probability the robbery would result in resistance and the need to meet that resistance with deadly force." (*Ibid.*) Here, no similar evidence suggests that Taylor planned an armed robbery carrying an increased risk to human life. We therefore conclude that the special circumstance must be vacated.

E.     *The Issue Whether Taylor Is Entitled to Have His Murder Conviction Vacated as a Result of Our Holding Is Better Resolved Below.*

Taylor argues that if we vacate the special circumstance we must also vacate the felony-murder conviction under Senate Bill No. 1437. Although we recognize that the new legislation may entitle him to such relief, we conclude that he must seek it in the trial court in the first instance.

As noted above, Senate Bill No. 1437 amended section 189 to provide that a defendant, like Taylor, who was not the actual killer or did not have an intent to kill is not liable for felony murder unless he or she "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); Stats. 2018, ch. 1015, § 3.) We agree with him that the standard under section 189, subdivision (e)(3) for holding such a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2(d), as the former provision expressly incorporates the latter.

Senate Bill No. 1437 applies to defendants, like Taylor, whose convictions are final. It added section 1170.95, which allows those "convicted of felony murder . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, subd. (a).) Before such a petition may be filed, the following three conditions must be

met: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder . . . . [¶] (2) The petitioner was convicted of first degree murder or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted of first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3).)

Upon receiving a petition that is supported by the petitioner's declaration that all three conditions are met and that makes a "prima facie showing that the petitioner falls within the provisions of [section 1170.95]," the sentencing court must issue an order to show cause. (§ 1170.95, subd. (c).) It must then "hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts." (§ 1170.95, subd. (d)(1).) Should they wish, "[t]he parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing. If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." (§ 1170.95, subd. (d)(2).) If, however, a hearing occurs, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. . . . The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).)

Two recent Court of Appeal decisions have held that defendants cannot seek relief under Senate Bill No. 1437 in direct appeals but instead must file petitions under section 1170.95. (*People v. Martinez* (2019) 31 Cal.App.5th 719, 727-729; accord *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1148, 1153.) We need not decide whether the same reasoning applies to preclude the seeking of such relief in a habeas petition. (See § 1170.95, subd. (f) ["This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner"].) Here, Taylor mentioned Senate Bill

20

No. 1437 in passing in his habeas petition, which was filed in the Supreme Court before the new legislation took effect. But he did not brief the issue of his entitlement to have the murder conviction itself vacated until he filed his traverse, and the Attorney General did not address the issue. Indeed, the Court issued an order to show cause "why petitioner is not entitled [to] relief under [*Banks*]," a decision that does not directly implicate Senate Bill No. 1437. Under these circumstances, we conclude that the more efficient course is for Taylor to seek to overturn his murder conviction by filing a section 1170.95 petition in the superior court. Once any such petition is filed, the parties will have the opportunity to address the effect of our holding on Taylor's entitlement to relief under Senate Bill No. 1437, an issue on which we express no opinion.

### III.
### DISPOSITION

The petition for a writ of habeas corpus is granted. The true finding on the robbery-murder special circumstance is vacated, and the matter is remanded with directions to resentence Taylor accordingly.

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.



_____

Sanchez, J.



*In re Taylor* A155328

22

Counsel for Petitioner:

Philip M. Brooks, under appointment by the Court of Appeal


Counsel for Respondent:

Xavier Becerra, Attorney General

Gerald A. Engler, Chief Assistant Attorney General

Jeffrey M. Laurence, Senior Assistant Attorney General

Laurence K. Sullivan, Supervising Deputy Attorney General

René A. Chacón, Deputy Attorney General

*In re Taylor*  A155328