Filed 11/18/22  P. v. Brown CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B314614 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A020874) |
| v. | |
| HOMER BROWN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney

General, Daniel C. Chang and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Homer Brown (defendant) pled guilty in 1982 to first degree murder during the course of a liquor store robbery he committed with a lifelong friend.  In 2019, defendant sought to vacate his sentence under Penal Code section 1172.6 (former section 1170.95).[1]  After holding an evidentiary hearing, the trial court denied the petition because it found, beyond a reasonable doubt, that defendant had acted as a major participant in the robbery who acted with reckless indifference to human life.  Defendant argues that this finding in not supported by substantial evidence.  He is incorrect, so we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts[2]

#### A. *The underlying crime*

In the fall of 1979, defendant and his "lifelong friend," Lionel Tate (Tate), went on a spree of liquor store robberies.

During the lunch hour of November 30, 1979, defendant

---

[1]     Effective June 30, 2022, section 1170.95 was renumbered section 1172.6 (Stats. 2022, ch. 58, § 10).  For simplicity's sake, we will refer to the section by its new numbering only.

All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Because the convictions here resulted from a plea, we derive the facts of the crimes from the preliminary hearing transcript, which we judicially notice.  (Evid. Code, §§ 459, 452, subd. (c).)

and Tate entered El Camino Liquor in Long Beach, California. The store was open to customers. Both defendant and Tate were armed with guns. Defendant put a gun to the store owner's head and announced "it was a holdup" as Tate put a gun to the head of another store employee. Defendant and Tate took the two store employees as well as a few store customers to the store's back room and ordered them onto the floor using "abusive" language. Defendant and Tate then escorted the owner at gunpoint to the cash register. When the owner fumbled while trying to get the register to open, one of the robbers pointed his gun at the owner and said he was "going to blow [him] away" if he did not open the register. Defendant and Tate then escorted the owner at gunpoint to the store's floor safe. Once that was emptied, defendant and Tate walked the owner to the backroom, ordered him to the ground, and told everyone on the ground, "Any one of you move, we'll shoot you." They then locked their hostages in the back room and left the store. The entire incident took "eight to ten minutes."

Around 7:30 a.m. the next morning, on December 1, 1979, defendant and Tate entered the HRJ Liquor Store in Paramount, California. The store was open to customers. As with the prior robbery, both defendant and Tate were armed with firearms. As with the prior robbery, both defendant and Tate at gunpoint escorted everyone in the store—in this case, the store's owner and three customers—into the cooler in the back of the store and ordered them to lie face down on the floor. When defendant and Tate were unable to locate the money in the location the owner said it would be, defendant and Tate kicked and beat him as he lay on the ground. They eventually said, "Let's get it over with," and, as with the prior robbery, escorted the owner at gunpoint to

3

the cash register.  Unlike the prior robbery, the owner of this store had a firearm tucked into his waistband.  When a new customer walked in and distracted defendant and Tate, the owner pulled out his gun and fired off three shots—two hit defendant and one hit Tate.  Either defendant or Tate shot the owner once in the chest, and then walked up to him, put a gun to the back of his skull, and shot him three times execution style. Either defendant or Tate then said, "Let's get the hell out of here," and fled the store.  The entire incident took about 15 minutes.

### B.    *Plea, conviction and appeal*

The People charged defendant and Tate with (1) the murder of the second liquor store owner (§ 187, subd. (a)), (2) the attempted robbery of the second liquor store owner (§§ 664, 211), and (3) six counts of robbery, as to the others from the two robberies (§ 211).  The People further alleged that defendant and Tate personally used firearms in connection with each charged crime (§§ 12022.5, 1206.06, subd. (a)(1)).  As to the murder, the People also alleged that the murder "was committed while the defendant" or "an accomplice" "was engaged in . . . [the] attempted commission of" a robbery (former § 190.2, subd. (a)(17)(A)).

In October 1981, the matter proceeded to a preliminary hearing, and the trial court sustained all of the charges.

On June 2, 1982, defendant pled guilty to murder and attempted robbery and admitted the firearm-use allegations as to both charges.  The remaining counts were dismissed.  The trial court sentenced defendant to life in prison without the possibility of parole on the murder count, and imposed but stayed a three-year prison sentence on the attempted robbery charge.

4

Defendant appealed, and we affirmed the judgment in an unpublished opinion.

## II.  Procedural Background

In January 2019, defendant filed a petition seeking to vacate his murder conviction under section 1172.6 on the ground that he was not the actual killer, did not aid and abet the actual killer, and was not a major participant in the robbery who acted with reckless indifference to human life.

In May 2021, the trial court held an evidentiary hearing regarding defendant's eligibility for relief under section 1172.6.[3] Neither the People nor defendant presented any new evidence. Instead, the parties argued whether the existing record supported a finding that defendant was a major participant in the robbery who acted with reckless indifference to human life, as those terms were defined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

In a subsequently issued ruling, the trial court denied defendant's petition.  The court indicated that it had considered the parties' motions and arguments, and reviewed the court file and all available transcripts.  Having reviewed the facts of the case, the court found "that [defendant] was a major participant in an armed robbery who was personally armed, personally entered the store, and personally participated in the murder of the store owner."  Specifically, the court found that defendant's "participation was substantial and greater than the actions of an ordinary aider and abettor to a felony murder in that he was

---

[3]     The trial court summarily denied defendant's petition, but we reversed that summary denial and remanded for an evidentiary hearing.  (*People v. Brown* (Oct. 23, 2020, B301245) [nonpub. opn.].)

5

instrumental in planning and directly perpetrating the felony." The court also found that defendant "acted with reckless disregard for human life" and was "convicted of murder under a still viable theory of murder."

Defendant filed this timely appeal.

## DISCUSSION

Defendant argues that the trial court erred in denying his petition to vacate his murder conviction and to resentence him under section 1172.6.

In 2018, our Legislature amended the definition of "murder" in our State to preclude a jury from "imput[ing]" the "malice" element of that crime "based solely on [a defendant's] participation in a crime." (§ 188, subd. (a)(3).) Our Legislature's purpose was to ensure that "[a] person's culpability for murder [is] premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1(g).) As amended, liability for murder is limited to persons (1) who are the actual killer, (2) who aided and abetted the actual killer in the murder (that is, who acted with the intent to kill), or (3) who were a major participant in the underlying felony that resulted in the killing, but only if they also acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e); e.g., *People v. Johns* (2020) 50 Cal.App.5th 46, 58-59.)

Section 1172.6 is the procedural vehicle by which persons convicted of murder in now-final judgments can seek to vacate convictions that do not satisfy the now-current definition of "murder." Where, as here, a defendant files a facially sufficient petition and the record does not otherwise foreclose relief as a matter of law, the trial court must issue an order to show cause and convene an evidentiary hearing. (§ 1172.6, subd. (c).) At the

6

hearing, the People have the burden of proving to the trial court, as an independent fact finder, that defendant is guilty of murder under a still-valid theory. (§ 1172.6, subd. (d)(3).) The parties have the option of introducing "new or additional" evidence, or may choose to rely on the record of the prior proceedings. (*Ibid.*)

The trial court in this case found beyond a reasonable doubt that defendant was guilty of murder under the still-valid theory that he was a major participant in the robbery that resulted in the store owner's death and that he acted with reckless indifference to human life. Defendant asserts that this finding is unsupported by the record. In evaluating this claim, we independently review the record to assess whether "substantial evidence"—that is, ""evidence which is reasonable, credible, and of solid value""—supports the trial court's finding. (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476.) In so doing, we view the evidence in the light most favorable to the court's finding, drawing all reasonable inferences in support of that finding. (*Ibid.*)

## I.    Pertinent Legal Principles

In *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, our Supreme Court more precisely defined when a person qualifies as a "major participant" who acts with "reckless indifference to human life."

Under *Banks* and *Clark*, a "major participant" in a burglary or attempted robbery is someone whose "personal involvement" is "substantial"; such a participant "need not be the ringleader," but his involvement must be "greater than the actions of an ordinary aider and abettor." (*Banks*, *supra*, 61 Cal.4th at pp. 801-802; *People v. Williams* (2015) 61 Cal.4th 1244, 1281.) Courts are to examine the totality of the circumstances when evaluating the

7

extent of participation, including several factors our Supreme Court identified in *Banks* as relevant but not dispositive on the issue: (1) the defendant/aider and abettor's role in planning the robbery; (2) his role in supplying or using lethal weapons; (3) his awareness of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; (4) his presence at the scene of the killing and thus whether he was "in a position to facilitate or prevent the actual murder"; and (5) his actions after the use of lethal force. (*Banks*, at p. 803; *Clark*, at p. 611.)

Under *Banks* and *Clark*, a defendant acts with reckless indifference to human life when he ""knowingly engag[es] in criminal activities known to carry a grave risk of death."" (*Banks*, *supra*, 61 Cal.4th at p. 801, quoting *People v. Estrada (*1995) 11 Cal.4th 568, 577, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157-158.) This standard "has a subjective and an objective" component. (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) To satisfy the subjective component, "'[t]he defendant must be aware of and willingly involved in the violent manner in which the [underlying felony] is committed,' and . . . must consciously disregard 'the significant risk of death his or her actions create.'" (*Scoggins*, at p. 677, quoting *Banks*, at p. 801.) The key is whether the defendant evinces "a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) To satisfy the objective component, the risk of death ""must be of such a nature and degree that, considering the nature and purpose of the [defendant's] conduct and the circumstances known to him[], its disregard involves a gross deviation from the

8

standard of conduct that a law-abiding person would observe in the [defendant's] situation.'"'" (*Scoggins*, at p. 677, quoting *Clark*, at p. 617.)

Our Supreme Court has identified a number of considerations bearing on whether a defendant has acted with reckless indifference to human life. "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks*, *supra*, 61 Cal.4th at p. 803); what matters is the totality of the considerations (*Scoggins*, *supra*, 9 Cal.5th at p. 677). The considerations are: (1) "Did the defendant use or know that a gun would be used during the [underlying] felony," and, relatedly, "[h]ow many weapons were ultimately used?"; (2) "Was the defendant physically present at the crime," such that he had "the opportunity to restrain the crime or aid the victim?"; (3) "What was the duration of the interaction between the perpetrators of the [underlying] felony and the victims?"; (4) "What was the defendant's knowledge of his . . . confederate's propensity for violence or likelihood of using lethal force?"; and (5) "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Ibid.*, citing *Clark*, *supra*, 63 Cal.4th at pp. 618-623.)

## II.    Analysis

Substantial evidence supports the trial court's findings that defendant acted as a "major participant" in the robbery of the second liquor store and that defendant acted with reckless indifference to human life.

### A.    *Major participant*

Substantial evidence supports the trial court's finding that defendant had "substantial" "personal involvement" in the second liquor store robbery.

9

Although there is no evidence regarding defendant's precise role in planning the robbery, the similarity of this robbery to the robbery the day before supports a finding that defendant and Tate *had* a plan—namely, take over the store by holding everyone at gunpoint, escort all employees and customers to the back of the store at gunpoint, and take the owner up front to empty the register and/or safe. Further, the record—viewed in the light most favorable to the trial court's finding—also supports the inference that defendant was to play the lead role in that plan given that *defendant* was the one in the first robbery who announced that "it was a holdup."

Although there is no evidence as to who supplied defendant and Tate with weapons, both of them carried firearms, those firearms were loaded, and defendant and Tate repeatedly pointed them at the liquor store owner and customers, impliedly threatening to use them if anyone resisted; indeed, during the first robbery, defendant and Tate explicitly threatened to shoot people with their firearms if their hostages resisted.

There is also evidence that defendant was aware of the "particular dangers posed by the nature of the crime, weapons used, [and] past experience or conduct" of his cohort Tate. It is well settled that "'there is a greater window of opportunity for violence'" when "a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods" (*Clark, supra*, 63 Cal.4th at p. 620; *In re Taylor* (2019) 34 Cal.App.5th 543, 558 (*Taylor*)), and here defendant and Taylor held the store owner and customers at gunpoint for close to 15 minutes before one of them shot the store owner. This danger is multiplied when, as here, the robbers elected to rob the store during its normal business hours when there were more likely to

10

be customers who would also need to be restrained, thereby further increasing the "obvious and extreme risks of lethal violence." (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1024 (*Owens*).) What is more, defendant was subjectively aware of the danger posed by Tate or by this circumstance generally because, during the robbery the day before, either Tate or defendant warned the robbery victims that they would "blow [them] away" and "if [they] move, we will kill you"—words indicating no hesitation to escalate the robbery into a murder, if need be. If it was Tate who threatened death, then defendant was aware of Tate's propensity to kill; if it was *defendant* who threatened death, then *defendant himself* was the one willing to kill. (*Owens*, at pp. 1024-1025 [a defendant's exposure to his cohort's conduct during a prior crime can impart knowledge of that cohort's propensity for violence].)

Defendant was present at the scene of the robbery the entire time, and his co-equal or lead role in directing the victims supports the finding that he could have either facilitated or prevented the store owner's murder; defendant chose to facilitate it.

Lastly, defendant's conduct after the use of lethal force was to flee the scene rather than provide aid to the store owner either he or Tate had shot execution style.

In the totality of the circumstances, substantial evidence supports a finding that defendant played a "substantial" "personal" role in the second liquor store robbery because he was *either* one of two co-equal central figures in the robbery *or* was the "lead" robber who directed Tate in their execution of the robbery.

11

**B.** *Reckless indifference to human life*

Substantial evidence supports the trial court's finding that defendant knowingly engaged in criminal activities known to carry a grave risk of death by evincing a willingness to kill that entailed a gross deviation from the standard of conduct that a law-abiding person would observe, and hence acted with reckless indifference to human life. Defendant knew that multiple loaded guns would not only be possessed but also used to order around the store owner and any customers because that was part of the plan defendant and Tate followed during the first liquor store robbery the day before. Based on the first robbery, defendant also knew that he and Tate would have no compunction about threatening to use those guns to "blow away" and "kill" anyone who did not follow their instructions. Defendant was physically present during the entire 15 minutes of the second liquor store robbery and, for the reasons noted above, could have intervened at any time to restrain Tate or aid the victim. The crime lasted 15 minutes while the liquor store was open to the public, during which time both defendant and Tate restrained the store owner and customers who happened to enter; as noted above, this scenario posed "obvious and extreme risks of lethal violence." (*Owens, supra,* 78 Cal.App.5th at p. 1024.) Defendant either exhibited his own propensity for violence—or knew of Tate's propensity—based on their threats, the day before, to "blow away" and "kill" the victims of the first liquor store robbery. And defendant took no efforts to minimize the risk of violence during the robbery.

**C.** *Analogous case*

In key respects, the facts of this case mirror the facts in *People v. Bascomb* (2020) 55 Cal.App.5th 1077, where the

12

defendant was found to be a major participant acting with reckless indifference to human life. There, Bascomb and a cohort forced their way into an apartment at gunpoint. (*Id.* at p. 1081.) Bascomb held one individual at gunpoint for a few minutes while the cohort entered a bedroom, briefly struggled with the occupant, and shot him. (*Ibid.*) The two then fled. (*Ibid.*) In assessing whether Bascomb acted with reckless indifference, the court noted: "Bascomb was willingly involved in the violent manner in which the robbery took place . . . . Bascomb didn't just watch without intervening as his accomplice accosted the murder victim in his bedroom, he used his weapon to keep the other victims at bay and thereby actively enabled the murder. Nor did he help the victim once he had been shot, but instead fled. We agree with the People that this sort of conduct easily meets our state's standard for what constitutes being a major participant who acted with reckless indifference to human life." (*Id.* at p. 1089.)

## III.  Defendant's Arguments

Defendant resists our conclusion with what boils down to five arguments. None has merit.

First, defendant argues that a person's "participation" in an armed robbery is not enough to establish that he was a major participant who acted with reckless indifference to human life. Relatedly, he argues that this was just a "garden-variety armed robbery." Defendant is correct that *mere* participation in an armed robbery is not enough (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1026 (*Bennett*); *Banks*, *supra*, 61 Cal.4th at p. 810; *Clark*, *supra*, 63 Cal.4th at p. 616), but he seems to leap from that proposition to the conclusion that *no level* of participation is enough. But that is simply an incorrect statement of the law

13

because it would mean that armed robbers are categorically immune from being major participants who act with reckless indifference to human life. By the same token, whether or not the robbery as a whole was a "garden-variety armed robbery" is irrelevant because what matters is *defendant's particular role* in *this particular* armed robbery. Defendant was not the getaway driver who waited around the corner while his cohorts robbed a liquor store after hours. Instead, defendant was one of the two robbers who followed a mutually agreed-upon plan to rob a liquor store by entering that store armed with loaded guns, while the store was open for business and thus anticipating the need to restrain the store's employees and any customers at gunpoint while they forced the owner to open the cash register. For the reasons explained above, defendant's particular role in this particular robbery qualifies him as a major participant who was recklessly indifferent to human life.

Second, defendant disputes various parts of our *Banks* and *Clark* analysis. He argues that his statements during the first and second liquor store robberies that "it was a hold up" and "let's get it over with" were just "isolated statements." Whether "isolated" or not, they evince defendant's leadership role in the first robbery and his willingness to do whatever it takes to get what he wants, which support the findings of his major participation as well as his reckless indifference to human life. He argues that there is no definitive evidence that *he* hurt anyone during the second liquor store robbery (because he and Tate had either successfully locked away or killed all percipient witnesses who could have identified him or Tate as the actual shooter). At best, that supports a finding that defendant may not have been the "actual killer"; it does not immunize him from

14

liability as a major participant in the underlying robbery who acted with reckless indifference to human life. What is more, accepting defendant's argument seems to mean that neither he nor Tate are actually responsible for the store owner's murder; we decline to adopt a rule of criminal liability that creates a loophole to liability for murder based on sequestering or killing all possible witnesses. Defendant argues that he had no reason to anticipate violence during the second liquor store robbery because he and Tate had managed not to use force during the first robbery, and that it was the second store owner's sudden and unexpected resistance that prompted the need for violence during the second robbery; in other words, defendant suggests, the resort to violence was really *the victim's* fault. What matters, however, is the recklessness with which defendant acted in electing to do a takeover robbery of a store during business hours with loaded guns; in this scenario, as courts have observed, there is always a risk someone might resist and this is precisely why this type of robbery poses "obvious and extreme risks of lethal violence." (*Owens, supra,* 78 Cal.App.5th at p. 1024.) To put it differently, the fact that defendant managed to walk through a proverbial gas-filled room with a lit match once without the room exploding does not mean there was no risk of explosion when he knowingly walked through with a lit match a second time. Defendant argues that he had no opportunity to help the victim or to stop the robbery because *he* himself had been shot twice and thus needed medical attention and because there was no evidence that he was within arm's reach of Tate during the robbery. We do not see how defendant's interest in preserving himself somehow excuses his callous indifference to the fate of the store owner whom either he or Tate repeatedly shot in the back of the

15

head. And defendant was present in the store the entire time with a loaded weapon; he had the means of restraining Tate whether or not they were close enough to hold hands.

Third, defendant cites a variety of cases he says support a finding in his favor. They do not, as they all involve very different factual scenarios. *Taylor*, *supra*, 34 Cal.App.5th 543, *Bennett*, *supra*, 26 Cal.App.5th 1002, and *In re Miller* (2017) 14 Cal.App.5th 960 (*Miller*) all involved the role of a defendant who was not present at the scene of the robbery. (*Taylor*, at p. 559; *Bennett*, at p. 1020; *Miller*, at p. 965.) Defendant in this case was present at the scene, armed with a loaded gun, and actively participating and directing the robbery itself as it was ongoing. In *In re Ramirez* (2019) 32 Cal.App.5th 384, 390, the defendant agreed with the plan to commit a carjacking and was in the general vicinity when it went down, but he was not "close enough to exercise a restraining effect on the crime or his colleagues" and had no prior knowledge of "his cohorts' likelihood of killing." (*Id.* at pp. 390, 405.) Defendant in this case was close enough to restrain Tate, and knew—from the robbery the day before—of Tate's willingness to use violence to get what he wanted.

Fourth, defendant cites what he perceives as flaws in the trial court's analysis, such as the court's statements that defendant fired his weapon during the second store robbery or that either he or Tate shot at a customer who tried to enter the store in the midst of the robbery. Because we are independently examining the substantiality of the evidence to support the trial court's findings, any errors in the trial court's reasoning are irrelevant; our independent analysis does not rely on any of the purported missteps.

16

Lastly, defendant argues that the trial court erred in "seemingly" relying solely on the summary of facts contained in our prior appellate decisions rather than the preliminary hearing transcript, and that the court did not cite to the passages of the hearing transcript in support of its findings. This argument ignores the trial court's own statement that it reviewed "all available transcripts" in making its findings; this is confirmed by the fact that court also relied on the preliminary hearing transcripts when it (erroneously) summarily denied defendant's petition. And there is no requirement that a trial court provide the parties with page or line references to the evidence it relies upon in coming to its findings in a section 1172.6 evidentiary hearing. What is more, because we have independently read the preliminary hearing transcript and conclude that it supports the trial court's finding, any procedural error here is harmless.

**DISPOSITION**

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ