Filed 8/20/20  P. v. Handwerk CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072738 |
| v. | (Super.Ct.No. INF065236) |
| RONALD WESLEY HANDWERK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge. Affirmed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

In 2012 a jury convicted defendant and appellant Ronald Wesley Handwerk of first degree murder.  The jury also found true a special circumstance allegation that defendant committed the murder during a robbery.  In 2019, defendant filed a petition for resentencing pursuant to newly enacted Penal Code section 1170.95,[1] which the trial court denied.  Defendant appealed.

On appeal, defendant argues that his petition was improperly denied because he made a prima facie showing that the provisions of section 1170.95 apply to him and that he is entitled to relief.  We affirm.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

(a)  The Killing of William Dobbs

In November 2007, Robert and Jackie lived in the ground floor studio apartment of a two-story duplex on Sage Street in Indio.  Handwerk occasionally stayed at the apartment.

Zuniga and his girlfriend, Melissa Johnson, stayed in the vacant, second floor apartment above the Dunsons' apartment.  The apartment had no electricity or running water.  They slept in a closet to keep warm.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  The Factual and Procedural Background is taken from this court's nonpublished 2015 opinion affirming defendant's judgment of conviction which is part of the record on appeal in this case.  (*People v. Dunson* (Feb. 26, 2015) E056565 [nonpub. opn.], fns. omitted.)

According to Johnson, Benavidez was Jackie's "on-again off-again" boyfriend and visited at the Dunsons' apartment occasionally but did not stay there. Johnson also said that Jackie was a prostitute, and Benavidez was known to bring clients, or "dates," to Jackie.

In November 2007, Robert, Jackie, Johnson, Zuniga, and Handwerk hung out together and smoked methamphetamine every day in the Dunsons' apartment. Benavidez would join them a couple of times per week.

On November 25, 2007, Johnson and Zuniga smoked a "little bit" of methamphetamine. For Johnson, it was the fourth day of a "crystal meth run," during which she did not sleep. That evening, she, Jackie, Robert, Zuniga, Handwerk, and Benavidez were together at the Dunsons' apartment. Benavidez said he would get a date for Jackie and bring him back to the apartment to have sex with Jackie. Robert told the others he would not let his sister have sex for money; instead, they would bring a man "back to the apartment, beat his ass, rob him, and take all of his shit." Benavidez nodded his head in agreement and said "okay," and that he would go get her a date. Jackie also nodded in agreement. Zuniga said nothing. Handwerk, who had been walking back and forth between the kitchen and living room and appeared to be listening, said nothing. Benavidez then left the apartment. Johnson and Zuniga went to the upstairs apartment.

It takes about five minutes to drive from the Dunsons' apartment to the Spotlight 29 casino. A surveillance videotape from the Spotlight 29 casino showed Benavidez entering the casino just after midnight during the morning of November 26, 2007. The

3

victim, William Dobbs, entered the casino about 1:15 a.m. Dobbs walked around the interior of the casino for about one-half hour, then walked outside. As Dobbs waited for the valet to bring his Cadillac Escalade, Benavidez stood near the doorway outside the casino, watching Dobbs. Dobbs left in the Escalade at 1:46 a.m.

Dobbs returned to the Spotlight 29 casino about 3:30 a.m. At 3:45 a.m., Dobbs met with Benavidez inside the casino. They talked briefly and then left together in Dobbs's Escalade.

Dobbs had a bank card which could be used to withdraw money from ATM's. A personal identification number, or PIN, must be used in order to use the card at an ATM.

At some point that night or early morning, Johnson woke to the voice of a man in the Dunsons' apartment screaming: "Oh, God. Please help me." Johnson described the screaming as "gut wrenching," "like someone is in pain, like they were hurt [and] screaming for someone to help them." She also heard "very loud" sounds of banging on a wall downstairs, "like something pretty heavy slamming up against the wall." Zuniga told Johnson to go back to sleep, which she did.

Handwerk went upstairs and knocked on the closet door where Johnson and Zuniga slept. He told Zuniga he needed to go downstairs "because . . . he had fucked somebody up and broke someone's ribs." Handwerk was holding his right hand in his left hand. Johnson could see that his hand was "messed up." Although Johnson pleaded with Zuniga not to go, Zuniga left with Handwerk. Johnson went back to sleep.

4

Johnson was next awakened by the sound of a vehicle engine starting up in the alley behind the apartment. It was still dark outside. Johnson walked downstairs where she saw Jackie standing at a fence that separated the property from the alley. There was no vehicle in the alley. Johnson asked Jackie about Zuniga. Jackie told her: " 'They just had to go[,] Melissa. They will be right back. They just had to go. They just had to go somewhere.' " Jackie seemed excited and a little agitated. Johnson walked back upstairs and went to sleep.

When Zuniga returned to the upstairs apartment, Johnson awoke. In response to Johnson's inquiries, Zuniga told her that Robert had "hurt that man very bad." Zuniga left a short time later because he had to be in court. Johnson went back to sleep and slept throughout that day.

Tamara Steinruck was a prostitute who had known Jackie and Robert for approximately 20 years. In November 2007, she was living in a car and using heroin two or three times per day. She had Jackie's permission to take showers at the Dunsons' apartment. In the pre-dawn hours of November 26, 2007, Steinruck walked to the Dunsons' apartment to take a shower. As she approached the apartment, she saw the back of a person walking away from the Dunsons' apartment. She later told a detective that the person was Benavidez and testified to that fact at the preliminary hearing in this case. At trial, however, she testified that she had "assumed" the person was Benavidez and that, after "getting [her] mind right" and off drugs, she recalled seeing Benavidez at a

5

gas station immediately before going to the Dunsons' apartment and not seeing him again that night. The gas station is 1.62 miles from the Dunsons' apartment.

As Steinruck approached the apartment, she heard Jackie arguing, yelling, and crying. Steinruck heard Jackie say, "he was acting stupid," and something to the effect of "[h]e doesn't want to give [the money] to her." A side door to the apartment was ajar. As Steinruck passed by that door, she heard Robert yelling loudly and angrily, " '[g]et down, mother fucker' " and "[t]hese better be the right PIN numbers." Steinruck watched Robert push a man to his knees. The man appeared to have blood under his chin. Robert then put a plastic bag over the man's head and used duct tape to secure the bag to the man's neck and face. The man appeared to be whimpering. Steinruck heard a male voice say, " 'Are you sure you can breathe?' " and Robert responded, " 'Yes, the mother fucker could breathe.' " Steinruck testified that the male voice was not Handwerk's. Robert again yelled: " 'This better be the right PIN numbers.' " As Steinruck began to leave, she heard Robert say: "Come on, mother fucker. We're going for a ride." Steinruck then left.

At 4:50 a.m.—about one hour after Benavidez and Dobbs left the Spotlight 29 casino—Jackie attempted to withdraw $500 from an ATM machine using Dobbs's bank card. The attempt was denied because it exceeded the daily withdrawal limit for the account. She then successfully withdrew $200 from the ATM. An attempt to obtain an additional $200 was denied.

6

Eight or nine hours later, during the evening of November 26, 2007, three unsuccessful attempts to withdraw money with Dobbs's bank card were made. No evidence was presented as to who made these attempts.

When Johnson went downstairs to the Dunsons' apartment during the morning of November 27, Robert was kneeling in a corner of the living room scrubbing the walls with bleach and pulling up carpet. Robert gave Johnson a bank card and a piece of paper with a PIN number written on it. He told Johnson to go to the ATM and pull out as much money as she could and bring it back to him, and she would get "a little bit of money in return for going." Johnson said she took the card "to get money to eat, to buy drugs, to have somewhere warm to sleep." Johnson looked at Zuniga; Zuniga said, "let's go."

Between 10:26 a.m. and 11:39 a.m. on November 27, Johnson and Zuniga used Dobbs's bank card to retrieve approximately $1,000 from different ATMs. Johnson put $300, one of the transaction receipts, the bank card, and the PIN number in a pocket; she ripped up the other transaction receipts and put the rest of the cash in her bra.

When she and Zuniga returned to the Dunsons' apartment, she gave the receipt, $300, the bank card, and the PIN number to Robert. Johnson kept the remaining cash. Jackie observed the exchange without comment. Jackie then said, "Oh shit. It's on T.V." When Johnson asked what she was talking about, Jackie said, "nothing" and "[d]on't worry about it."

Dobbs's body was found on November 27 in a desolate area about two miles from the Spotlight 29 casino. A black bag had been attached to his neck with red tape. A

Spotlight 29 valet parking pass was in his pocket. Dobbs had been stabbed with a sharp instrument, perhaps a knife, 14 times, mostly on his face and neck. His internal and external jugular veins and carotid artery were severed, which would have caused him to bleed to death very quickly. His trachea was also severed, which would have made it impossible for him to breathe. He had multiple bruises and abrasions on his face and scalp, and signs of blunt force trauma to his chest. The force was strong enough to break four ribs, which caused ruptures to his liver and lung. The forensic pathologist who performed the autopsy on Dobbs described the injuries as "brutal," and said it "looked like perhaps some injuries were inflicted for the purpose of torture" and for "causing pain." He believed that "[t]his is something that went on for a number of minutes or longer, . . . maybe 15, 20, 30 minutes. . . . Maybe more."

(b) The Aftermath

In the days following the incident, Johnson "nagged" Zuniga to tell her what happened. Eventually, as she, Zuniga, and Handwerk were walking near the Indio library, Zuniga told her that Robert "had murdered that man." Handwerk was standing next to Zuniga at that time. When Johnson said, " '[a]re you fucking kidding me,' " Handwerk said, "Yes, it happened." Zuniga elaborated, saying that the man had been beaten, his ribs had been broken, and he was stabbed in the back and neck. Handwerk agreed with Zuniga and said he had cracked the man's ribs. Handwerk explained that the man was murdered because he would have been able to identify Handwerk and Robert. Johnson noticed that Handwerk's right hand was bruised and swollen, and that Handwerk

8

had been complaining that his hand was sore and about how he was unable to move his fingers.

Sometime after this conversation with Zuniga and Handwerk, Johnson met Jackie outside a convenience store. Jackie told Johnson she had been picked up and questioned by the police. Jackie told Johnson that if she was questioned by the police to tell them that she (Johnson) did not know her (Jackie) and had never seen or talked to her. Jackie also told her that the bank card Robert gave her belonged to the murdered man.

On December 1, 2007, four days after Dobbs's body was found, a detective found Dobbs's Escalade about 100 yards away from the Dunsons' apartment. Dobbs's blood was found in the Escalade.

Benavidez was questioned by detectives on December 1, 2007. When Riverside County Sheriff's Detective Kenneth Patterson asked Benavidez if he had been at the Spotlight 29 casino on or about November 26, 2007, Benavidez initially said "no." But when confronted with information regarding videotaped surveillance, Benavidez admitted he had been there, but denied meeting or leaving the casino with Dobbs.

The detective observed that Benavidez's shoes appeared to have paint on them. The shoes appeared to be the same shoes Benavidez was wearing in the Spotlight 29 casino surveillance videotape. Benavidez told the detective he had painted the shoes earlier that day or the day before. The detective collected the shoes from Benavidez and had them tested "[f]or blood." The results of the test were not introduced into evidence. Photographs of the painted shoes were shown to the jury.

9

After his police interview, Benavidez went to the Dunsons' apartment where he told Johnson he had been picked up by the police and held for murder. He told Johnson that he had gone to the casino to pick up a date for Jackie and that the police had a videotaped recording of him leaving the casino with the man he brought back to the Dunsons' apartment. He explained that the police let him go because "that's all they had."

Steinruck testified about a statement Jackie made to her about two weeks after the incident. They were walking along a street when a police car passed by. According to Steinruck, Jackie began to panic and act nervous. Jackie told Steinruck that she feared the police would be coming for her "because Robert killed" a man and that she had used the victim's bank card. Jackie explained to Steinruck that Benavidez brought her a date from a casino and that the man started acting stupid and refused to pay her. She said Robert argued with the man, that "it got out of hand," and Robert killed him.

During trial, Steinruck and Jackie were among others being transported by bus from the jail to the courthouse. Jackie announced: " 'That bitch is the snitch on my case,' " and told Steinruck, " 'You better go in there and tell them you were lying.' " The jury was instructed that this testimony could be considered for evaluating any bias in Steinruck's testimony.

On January 8, 2007, a parole compliance search was conducted at the Dunsons' apartment. A 10- or 11-inch knife—larger than permitted under Robert's parole

10

conditions—was found in the laundry room. The knife had Robert's blood on it, not Dobbs's.

(c) Police Interview of Handwerk

In April 2009, about 17 months after Dobbs was killed, Detective Patterson interviewed Handwerk. Handwerk initially said he "kn[e]w nothing," but eventually acknowledged that he had been involved in a fight with Dobbs. He said the fight occurred in the Dunsons' living room during the early morning of November 26, 2007. It ended when Robert got a "control hold" on Dobbs and Dobbs stopped resisting. Robert initially explained to Handwerk that he was beating Dobbs because Dobbs " 'disrespected his sister.' " Later, Handwerk learned that Robert had been beating Dobbs to get Dobbs's wallet.

When Detective Patterson asked Handwerk if he went to the bank, Handwerk initially said, " 'No, I would never do that because that would make me an accessory.' " Later, Handwerk admitted, " 'yeah, I did go to the bank.' " He explained that Robert had "possession" of the bank card and "obtained" the PIN. Handwerk then drove to the bank in Dobbs's SUV. He was gone five or 10 minutes. Handwerk did not tell Detective Patterson that he personally held or used the card or PIN, or that he received any money. After going to the bank, Handwerk returned to the apartment and parked the SUV in the alley behind the apartment.

Handwerk further told Detective Patterson that when he got back from the bank, Zuniga and Robert were "marching" Dobbs out of the apartment. Dobbs had a plastic

bag over his head and Handwerk could hear him whimpering. As Handwerk collected his things to leave, he heard the SUV drive away. It was still dark outside. He then went to a casino.

Detective Patterson explained to Handwerk that his interviews with others led him to believe that "[t]his was not a scam about sex. This was a scam to rob the guy. To get him there, beat him, rob him, and take his money." Handwerk agreed.

Handwerk also acknowledged that he was present near the Indio library when Zuniga spoke to Johnson about the murder. He said that Johnson and Zuniga were crying and he assumed it had to do with the incident involving Dobbs, but he told Detective Paterson he was not involved in that conversation.

Neither Benavidez nor Handwerk presented a defense.

A jury convicted defendant of first degree murder (§ 187, subd. (a)). The jury also found true a special circumstance allegation that defendant committed the murder during a robbery. (§ 190.2, subd. (a)(17)(A).) The sentencing court sentenced defendant to life without the possibility of parole.

Defendant appealed his judgment, and in 2015 this court affirmed defendant's conviction. (*People v. Dunson*, *supra*, E056565.)

On January 4, 2019, defendant filed a petition for resentencing pursuant to newly enacted section 1170.95.

12

The trial court set a status conference on the petition for March 8, 2019. This was eventually continued to March 15, 2019. On March 1, 2019, the People filed an opposition to defendant's petition for resentencing. Defendant did not file a reply prior to the status conference.

At the status conference, defendant was represented by counsel. The trial court denied defendant's petition on the basis that "the jury specifically found the special circumstance of the felony murder special true. That being the case, it has been one of the surviving predicates under 1437 that has been proved as a matter of law."

Defendant timely appealed.

## III. DISCUSSION

Defendant argues that the trial court improperly denied defendant's petition for resentencing because defendant did state a prima facie case for eligibility for relief. We agree.[3]

A.     Defendant's Petition Made Prima Facie Case for Eligibility Under Section 1170.95

*1.     History of Senate Bill 1437*

Senate Bill 1437 "which became effective on January 1, 2019, addresses certain aspects of California law regarding felony murder and the natural and probable

---

[3] Defendant also argues that Senate Bill No. 1437 (Senate Bill 1437) and section 1170.95 are constitutional and that the trial court's denial of his petition violated his state and federal constitutional rights. Because neither the trial court nor the People addressed the constitutionality of Senate Bill 1437 and section 1170.95, and we find the trial court erred on non-constitutional grounds, we do not address defendant's constitutional arguments.

13

consequences doctrine by amending Penal Code sections 188 and 189, as well as by adding Penal Code section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in law would affect their previously sustained convictions." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722-723 (*Martinez*).)

Prior to Senate Bill 1437's enactment, a person who knowingly aided and abetted a crime, the natural and probable consequence of which was murder or attempted murder, could be convicted of not only the target crime but also of the resulting murder or attempted murder. (*People v. Chiu* (2014) 59 Cal.4th 155, 161; *In re R.G.* (2019) 35 Cal.App.5th 141, 144 (*R.G.*).) "This was true irrespective of whether the defendant harbored malice aforethought. Liability was imposed ' "for the criminal harms [the defendant] . . . naturally, probably, and foreseeably put in motion." [Citations.]' [Citation.]" (*R.G.*, at p. 144.)

Senate Bill 1437 "redefined 'malice' in section 188. Now, to be convicted of murder, a principal must act with malice aforethought; malice can no longer 'be imputed to a person based solely on [his or her] participation in a crime.' (§ 188, subd. (a)(3).)" (*R.G., supra*, 35 Cal.App.5th at p. 144.) "Senate Bill 1437 also amended section 189, which defines first and second degree murder, by, among other things, adding subdivision (e). Under that subdivision, a participant in enumerated crimes is liable under the felony-murder doctrine only if he or she was the actual killer; or, with the intent to kill, aided and abetted the actual killer in commission of first degree murder; or was a

major participant in the underlying felony and acted with reckless indifference to human life." (*People v. Munoz* (2019) 39 Cal.App.5th 738, 749.)

Senate Bill 1437 also added section 1170.95, which states that "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, subd. (a).) An offender may file a section 1170.95 petition if he or she was prosecuted under a felony murder or natural and probable consequences theory, but under amended sections 188 or 189, could not have been convicted of first or second degree murder. (§ 1170.95, subd. (a).)

2.      *Process for Review of a Petition Under Section 1170.95*

The trial court's review of a petition under section 1170.95 occurs in several phases. A petitioner must meet the standards of each before proceeding to an evidentiary hearing on the full merits of the petition. First, the trial court determines whether the petition is complete as defined in subdivision (b)—that is, whether it contains the minimum necessary components the statute requires of a petition. If the petition is facially adequate, the trial court next determines whether "the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) If so, the trial court appoints counsel (if requested by the

petitioner), and may extend the briefing schedule set by the statute.**4** The statutory deadlines require that the People file any opposition to the petition up to 60 days after the petition was served, and the defendant may serve any reply up to 30 days after the People's opposition is served. (§ 1170.95, subd. (c).) After briefing, the court determines whether the petitioner has stated a prima facie case that he or she is entitled to relief. If so, the court must issue an order to show cause and hold a hearing to determine whether to re-sentence the petitioner. (§ 1170.95, subds. (c)-(d).)

Section 1170.95, subdivision (c), thus requires the trial court to make two prima facie assessments. "The first is whether the petitioner has made a prima facie showing of eligibility for relief. A petitioner is eligible for relief if he or she makes a prima facie showing of the three criteria listed in section 1170.95(a)—namely he or she (1) was charged with murder 'under a theory of felony murder or murder under the natural and probable consequences doctrine,' (2) was convicted of first or second degree murder, and (3) can no longer be convicted of first or second degree murder 'because of changes to Section 188 or 189 made effective January 1, 2019.' " (*People v. Drayton* (2020) 47

---

**4** When petitioner is entitled to have counsel appointed is currently under review by our Supreme Court. (*People v. Verdugo* (2020) 44 Cal.App.5th 320 (*Verdugo*), review granted Mar. 18, 2020, S260493; *People v. Lewis* (2020) 43 Cal.App.5th 1128 (*Lewis*), review granted Mar. 18, 2020, S260598; *People v. Cornelius* (2020) 44 Cal.App.5th 54 (*Cornelius*), review granted Mar. 18, 2020, S260410.) However, pending further guidance from our Supreme Court, we agree with *Verdugo*, *Cornelius*, and *Lewis* and conclude that counsel need not be appointed until after a trial court concludes that the petitioner has made a prima facie showing that he or she falls within the provisions of the statute. (*Verdugo*, at p. 332-333, *Lewis*, at p. 1140, *Cornelius*, at p. 58.) We also agree with *Lewis* and *Verdugo*'s broader conclusion that 1170.95 is laid out in chronological order, and that events under it proceed in the order they are enumerated in the statute. (*Lewis*, at p. 1140, Verdugo, at p. 332.)

Cal.App.5th 965, 975-976 (*Drayton*), italics omitted.)  "If the trial court determines a petitioner has made a prima facie showing of eligibility for relief, the court proceeds to the 'second' inquiry into the prima facie showing under section 1170.95(c).  [Citation.] In this second step, the trial [court] considers whether the petitioner has made a prima facie showing of entitlement to (rather than eligibility for) relief."  (*Id.* at p. 976, italics omitted.)[5]  Only after these first two prima facie review phases are complete, and the court is satisfied that the petition is meritorious under these standards, does it then issue an order to show cause and hold a hearing on the petition's merits.

### 3.    *Defendant Stated a Prima Facie Case for Eligibility*

Because the trial court in this case denied defendant's petition before defendant's opportunity to respond expired, the record indicates that the trial court denied the petition on the basis that defendant did not meet the first prima facie showing of eligibility for relief.  Had the trial court concluded that defendant was eligible, it would have been required to provide defendant with time to file formal briefing at a minimum.  This did not happen.  Thus, we review whether the trial court erred in implicitly finding that

---

[5]  Defendant cites to *Martinez, supra*, 31 Cal.App.5th at p. 723 and *In re Taylor* (2019) 34 Cal.App.5th 543, 562 for the proposition that once a petitioner makes a prima facie showing he or she falls within the provisions of section 1170.95, the court must then issue an order to show cause.  Neither of these cases addressed what prima facie showing is required under section 1170.95, and only summarized the statute's procedures for context.  Our colleagues in the Sixth District and elsewhere have more closely analyzed this provision of the statute and concluded that it requires two separate prima facie showings.  (See *Drayton, supra*, 47 Cal.App.5th at pp. 975-976.)  We agree with this approach.  We also agree that the statute only requires the trial court to issue an order to show cause once it is satisfied that defendant has made a prima facie showing of entitlement to relief, not merely eligibility.

17

defendant failed to state a prima facie case that he fell within the provisions of the section.

The appropriate standard for review of the denial of a petition under section 1170.95 is set forth in *Drayton*, *supra*, 47 Cal.App.5th at pp. 980-981. As that case notes, "[a]ppellate review of petitions in similar context, such as Proposition 47, typically involves multiple standards of review." (*Ibid.*) In Proposition 47 cases, we review the trial court's decision under a mixed question of law and fact standard. Thus, " '[w]here an appeal involves the interpretation of a statute . . . , the issue on appeal is a legal one, which we review de novo. Where the trial court applies disputed facts to such a statute, we review the factual findings for substantial evidence and the application of those facts to the statute de novo. [Citation.] " '[A]n order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown.' " [Citation.] In addition, we must " 'view the record in the light most favorable to the trial court's ruling.' " ' " (*People v. Sledge* (2017) 7 Cal.App.5th 1089, 1095-1096 (*Sledge*).)

Here, the trial court never acted as a factfinder. It simply reviewed the petition and record of conviction to determine whether petitioner made a prima facie showing of eligibility for relief. Therefore, we review the trial court's determination that defendant failed to make a prima facie showing of eligibility for relief de novo.

Next, we turn to what kind of review section 1170.95 requires. The statute does not set out a precise standard for reviewing whether a petition states a prima facie case

18

that the petitioner falls within the provisions of the statute. However, given that this review is statutorily distinct from the facial sufficiency required under section 1170.95, subdivision (b), and the more substantive prima facie analysis under subdivision (c), we can conclude that the relevant standard is somewhere between those two.

We conclude that reviewing a petition to determine whether it states a prima facie case for statutory eligibility is analogous to a preliminary review of statutory eligibility for resentencing under Propositions 36 and 47.[6] Under both these types of review, the petitioner must first "establish his or her *initial eligibility* for relief," after which the prosecution gets the opportunity to show that the petitioner is ineligible for relief. (*Sledge*, *supra*, 7 Cal.App.5th at p. 1094.) In both cases, an evidentiary hearing is not necessary to resolve the question of eligibility for relief, but " '[a]n evidentiary hearing is required if . . . there is a reasonable likelihood that the petitioner may be entitled to relief and the petitioner's entitlement to relief depends on the resolution of an issue of fact.' " (*Id.* at p. 1095, quoting California Rules of Court, rule 4.551(f).)

This procedure is very similar to the statutory procedure set out in section 1170.95. All three require a trial court to preliminarily determine whether the petition sets out a prima facie case of eligibility for relief, an opportunity for the parties to

---

**6** This was the conclusion our Second District colleagues reached in *Verdugo*, *supra*, 44 Cal.App.5th at p. 329. This case is currently under review by our Supreme Court, though the relevant analysis is not under review. (See *People v. Lewis*, S260598, Supreme Ct. Mins., Mar. 18, 2020 [requesting briefing and argument only on whether superior courts can "consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief," under section 1170.95 and when the right to appointed counsel arises under the same].)

19

dispute eligibility, and the opportunity for an evidentiary hearing if the court determines that the petitioner has established a prima facie case that he or she is both eligible for and entitled to relief.

When performing the preliminary review for statutory eligibility under Propositions 36 and 47—and, analogously, under section 1170.95—the " 'court's role . . . is simply to decide whether the petitioner is ineligible for relief as a matter of law, making all factual inferences in favor of the petitioner.' " (*People v. Torres* (2020) 46 Cal.App.5th 1168, 1178 (*Torres*).)  Thus, our review must be whether the trial court erred in finding that defendant was not eligible for relief as a matter of law.

There is no question that defendant's petition meets the first two criteria to show a prima face case of eligibility for relief.  Defendant was charged and convicted of murder under a felony-murder theory.  The only question is whether he meets the third criteria—namely, that he can no longer be convicted of murder under the law as it exists now.  As the People point out, the jury in defendant's 2012 case found true the special allegation that the murder occurred during a robbery.[7]  This necessarily required the jury to find that defendant either acted with the intent to kill or was a major participant in the underlying crime who acted with reckless indifference to human life.  (See § 190.2,

_____

[7]  Again, whether a trial court may "consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief" is currently under review by our Supreme Court.  (See *People v. Lewis*, S260598, Supreme Ct. Mins., Mar. 18, 2020.)  Pending further guidance from our Supreme Court, we agree with *Lewis* and conclude that a trial court may look at the entire record of conviction, including the appellate court's opinion on direct appeal, to determine whether defendant has made either necessary prima facie showing.

20

subd. (a)(17)(B); *People v. Estrada* (1995) 11 Cal.4th 568, 575 [finding that a person may be sentenced to life in prison without the possibility of parole only if they are "found to have acted with 'reckless indifference to human life and as a major participant' in the commission of the underlying felony"].) They contend that this makes defendant legally ineligible for relief under section 1170.95.

However, as our colleagues in the Second District recently recognized, a true finding on a robbery-murder special circumstances allegation is not enough, on its own, to allow a trial court to conclude a petitioner is not entitled to relief under section 1170.95 where the finding occurred prior to our Supreme Court's recent clarification of what those terms mean. In *Torres*, *supra*, 46 Cal.App.5th at page 1178 the trial court denied a petition under section 1170.95 because "the existence of the jury's 2001 robbery murder special circumstance findings alone established that Torres was 'a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2' [citation], as a matter of law, thereby barring him from relief." The court in *Torres* disagreed with the trial court's holding. It found that "[a]lthough the jury's special circumstances findings rendered in 2001 indicate that the jury concluded Torres was a 'major participant' who acted with 'reckless indifference to human life' in the murders . . . , those jury findings alone do not preclude Torres from showing today that he could not be convicted of first or second degree murder as redefined by Senate Bill 1437." (*Torres*, at p. 1179.) This conclusion is based upon the fact that our Supreme Court has since narrowed the definition of what it means to be a

major participant or to act with reckless indifference to human life. (See *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*); *Torres*, at p. 1179.)

There is no question that the trial court in this case based its denial of defendant's petition entirely on the true special circumstances allegation. The trial court explicitly said it was denying defendant's petition because "the jury specifically found the special circumstance . . . true. That being the case, it has been one of the surviving predicates under 1437 that has been proved as a matter of law." As discussed above, it is not true that a pre-*Banks* and *Clark* special circumstances finding establishes, as a matter of law, that defendant is not eligible for relief under section 1170.95.

We can identify no meaningful difference between *Torres* and the case here. Both involved the denial of a petition under section 1170.95 for failing to show a prima facie case for eligibility for relief. Both involved findings by the trial court that a robbery special murder circumstance was determinative of defendant's eligibility for relief. We conclude, as did the court in *Torres*, that the trial court in this case erred in summarily denying defendant's petition.

B.      The Trial Court's Error Was Harmless

Although the trial court erred by concluding the special circumstance finding on its own meant defendant was not eligible for relief, we conclude the error was harmless because the record demonstrates defendant was a major participant who acted with

reckless indifference to human life under the standards set forth in *Banks* and *Clark*. As a result, we conclude the denial of defendant's petition was proper.

Whether there is sufficient evidence that defendant was a major participant in the underlying crime who acted with reckless indifference to human life is a question we can decide on appeal. A "[d]efendant's claim that the evidence presented against him failed to support [a] . . . robbery-murder special circumstance [finding made prior to *Banks* and *Clark*] . . . is not a 'routine' claim of insufficient evidence." (*In re Miller* (2017) 14 Cal.App.5th 960, 979-980; see *People v. Law* (2020) 48 Cal.App.5th 811 (*Law*), review granted July 8, 2020, S262490.) The "claim does not require resolution of disputed facts; the facts are a given." (*In re Miller*, at p. 980.)

In *Banks*, our Supreme Court described what is often referred to as the *Tison-Enmund* spectrum, after the United States Supreme Court's decisions in *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782. "At one extreme" are people like the defendant in *Enmund*—"the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." (*Banks*, *supra*, 61 Cal.4th at p. 800.) "At the other extreme [are] actual killers and those who attempted or intended to kill." (*Ibid.*) Section 190.2, subdivision (d), covers those people who fall " 'into neither of these neat categories' "—people like the Tison brothers, who were major participants in the underlying felony and acted with a reckless indifference to human life. (*Ibid.*)

Our Supreme Court articulated several factors intended to aid in determining whether a defendant falls into this middle category. The relevant questions are "[w]hat role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

These considerations weigh against defendant in this proceeding. Defendant was present when the others discussed the plan to "bring a man 'back to the apartment, beat his ass, rob him, and take all of his shit.' " Though defendant heard the plan, he did not object to it. Later that evening, Johnson heard a man screaming. Johnson then heard defendant wake Zuniga to tell Zuniga " 'he had fucked somebody up and broke someone's ribs,' " and Zuniga needed to go downstairs. At the time "[defendant] was holding his right hand in his left hand," and "Johnson could see that his hand was 'messed up.' " The victim's body showed evidence of a severe beating, consistent with defendant's statement that he broke the victim's ribs. Defendant then confessed to Johnson that he beat the victim and Robert killed him because he could have identified

24

Robert and defendant. Defendant later admitted to the police that he took the victim's debit card and PIN to a bank to attempt to withdraw cash.

Therefore, there is little question that defendant had a major role in the underlying criminal robbery and assault of the victim for money. He was present during the planning and did not object. Defendant himself admitted to participating in the underlying crime by violently assaulting the victim—breaking his ribs and taking the victim's debit card and PIN to a bank in an attempt to withdraw cash. Defendant admitted seeing the victim with a plastic bag over his head and did nothing to help or stop the killing. Defendant heard the gut wrenching screams of the victim while the victim was being beaten. Defendant was aware the victim was falsely imprisoned while attempts to make ATM withdrawals from his accounts were being made. Overwhelming evidence establishes that defendant not only participated in the beatings but that he apparently acquiesced to the killing in order to silence the victim. Defendant was the quintessential major participant in the intended felony to beat the victim for money who acted with reckless disregard for life. It is difficult to imagine a more compelling case of a major participant who acted with reckless disregard for life than is demonstrated by defendant's conduct on this record.

"Although the trial court erred by concluding the special circumstance finding, on its own, rendered [defendant] ineligible for relief—that is, the court erred by failing to determine whether [defendant] qualified as a major participant who acted with reckless indifference to human life under *Banks* and *Clark*—we conclude the error was harmless

25

because the record demonstrates the answer to that question is yes.  As a result, we conclude the denial of [defendant's] petition was proper."  (*Law*, *supra*, 48 Cal.App.5th at p. 825.)

## IV.  DISPOSITION

We affirm the trial court's order denying defendant's petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:


MILLER _____
Acting P. J.


RAPHAEL _____
J.