Filed 10/21/25  P. v. Torkelson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D084188 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD193624) |
| JAMES DAVID TORKELSON, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin H. Urbanski, Christopher P. Beesley and Cobi Furdek, Deputy Attorneys General, for Plaintiff and Respondent.


James David Torkelson appeals the order denying his petition to vacate two felony murder convictions under Penal Code section 1172.6.  After

holding an evidentiary hearing, the trial court found beyond a reasonable doubt that Torkelson was a major participant who acted with reckless indifference to human life in the underlying robbery and ruled he was ineligible for relief. Torkelson contends the evidence was legally insufficient to support the trial court's findings. We disagree and affirm the order.

I.

BACKGROUND

A. *Facts*

Torkelson worked the midnight shift as an unarmed security guard at Five Star Park, Shuttle, and Fly (Five Star), a long-term parking lot that opened in July of 1999 near the San Diego International Airport. He was 21 years old at the time. Torkelson was consistently late for work and did not show up at all on July 11–12. He was fired and replaced by David Bond.

On July 12, 1999, Torkelson was in Arizona with his friend, Jeffrey Young, whom he had met in San Diego at Aryan Nation meetings. They stayed with Jason Getscher at his home for a few days. Young and Getscher had become friends while they were in prison together in Arizona. Young and Getscher introduced Torkelson to Max Anderson, who was also staying with Getscher and had served time in prison with him and Young.

While Anderson was staying with Getscher, he broke into a motorcycle shop and stole payroll checks, which Torkelson and Young unsuccessfully tried to cash at a bank. Torkelson then proposed that he, Anderson, and Young rob Five Star. Anderson said he would provide firearms. Torkelson telephoned David Raynoha, a friend with whom he had spent time in juvenile hall, to enlist his help in the robbery. Torkelson told Raynoha that he "had a place, . . . the guys, the guns, everything set up, all [Raynoha] had to do was show up." Raynoha needed money and agreed to help.

2

Anderson, Torkelson, and Young traveled in Anderson's truck to San Diego, where they met with Raynoha on July 17, 1999, to finalize the plan for the Five Star robbery. Torkelson drew a diagram of the lot, told the others the security cameras were not yet operational, and laid out the plan for the robbery. Torkelson would pretend to show up for his midnight shift and would transport Anderson, Raynoha, and Young onto the lot hidden inside a vehicle. At that time, Torkelson expected there to be on the premises a cashier booth attendant at the entrance of the parking lot, a shuttle driver, and a manager who would be inside the office trailer counting the money from the previous shift. Torkelson would go to a far corner of the parking lot while pretending to be taking inventory of the vehicles, wait for the shuttle driver to leave for the airport, and then signal the others by a two-way radio to get out of the vehicle and start the robbery. Raynoha would detain the cashier booth attendant at the entrance to the lot. Anderson and Young would enter the trailer, cut the telephone lines, bind the manager with duct tape, and steal the money. After discussing these plans, the group drove past Five Star to view the layout and to plan the getaway. The getaway plan was to steal the manager's car keys, drive his car off the lot to Anderson's truck, which would be parked near a freeway entrance, and transfer to the truck.

The four next drove to Torkelson's girlfriend's house in Tierrasanta and dropped him off at sundown. Anderson, Raynoha, and Young proceeded to a nearby convenience store and parked in the lot. Anderson had a bag on the floorboard of his truck from which he gave Raynoha and Young each one gun and kept two for himself. They discussed that the guns were "loaded" and "ready to go." Torkelson pulled up in a sports utility vehicle (SUV), gave the others nylon stockings, and left. Raynoha gave Anderson duct tape to bind the victims. Anderson, Raynoha, and Young waited for Torkelson to return.

Torkelson drove the SUV back to the convenience store parking lot at about 11:00 p.m. He was wearing his security guard uniform. He made a purchase and then drove toward Five Star. Anderson, Raynoha, and Young followed Torkelson in Anderson's truck and parked across the street from where Torkelson had parked. Torkelson gave Anderson a two-way radio and kept one for himself. Anderson, Raynoha, and Young got into the back of the SUV with their loaded guns, put on gloves, pulled the nylon stockings over their heads, and lay down.

At approximately 11:30 p.m., Torkelson drove the SUV into the Five Star parking lot and parked behind the office trailer. He exited the SUV and told Anderson, Raynoha, and Young to wait for his signal to begin the robbery. Pelvic Reid, the security guard who was finishing his shift, spotted Torkelson, whom he heard had been fired, and asked whether Torkelson had spoken to their supervisor. Torkelson assured Reid everything was fine and he could leave. Bond soon arrived expecting to work the midnight shift, but Torkelson said he was going to work the shift and sent Bond home. After Bond and Reid departed, the only employees left on the Five Star lot were Kendrick Bowman, the night shift cashier booth attendant; Teresa Perez, the prior shift cashier booth attendant; Jack Reynolds, the night shift manager; and the shuttle driver. Torkelson walked for about 10 minutes to the far corner of the parking lot to start taking inventory of the cars.

When Torkelson got to the far corner of the lot and the shuttle driver had left for the airport at some time between 12:00 and 12:30 a.m. on July 18, 1999, Torkelson radioed Anderson to start the robbery. Anderson, Raynoha, and Young exited the SUV. Perez appeared, went to her car, and then disappeared behind the trailer. Raynoha pointed his gun at Bowman and ordered him to lie prone on the floor of one of the cashier booths. Bowman

4

complied, as Five Star had trained its employees to do. While Raynoha was taking the money from the cash register, Bowman pressed a button on his radio to try to alert Torkelson that something was wrong, but Torkelson did not respond. Meanwhile, Anderson and Young entered the office trailer. Perez reappeared and entered the trailer when Raynoha pointed his gun at her and commanded her to do so. Young shot Perez twice in the back of the head as she lay on the floor, and Anderson did the same to Reynolds. Young and Anderson ran out of the office trailer wearing stockings over their heads and holding guns.

As Anderson and Young fled the office trailer, Daniel Maman arrived at Five Star in a van to pick up Perez. Raynoha saw the van arrive. Anderson, Young, and Raynoha all fired shots at Maman, who sped away.

Anderson, Raynoha, and Young ran to Perez's car and got inside. Anderson tossed a bag of cash to Raynoha and tried to start the car, but he inserted the key into the ignition upside-down and the car would not start. They abandoned Perez's car and ran to the street. Raynoha saw a car with its headlights on and engine running across the street at another parking lot. He pointed his gun at the owner, James Gagarin, who told him to take the car. Raynoha got into the driver's seat, and Anderson got into the front passenger's seat. They picked up Young on the way to Anderson's truck, switched vehicles, and drove to Tierrasanta. The three men divided up the money they had stolen from Five Star and left Torkelson's share in a box outside his girlfriend's house.

Meanwhile, Bowman summoned police to Five Star by calling 911 from the telephone in his cashier booth after Anderson, Raynoha, and Young fired their guns at Maman and fled. During the call, Torkelson ran toward Bowman and shouted there were "two down," "187," and "no pulse." When

police arrived, they entered the office trailer and found Perez and Reynolds lying dead on the floor with brain matter protruding from the backs of their heads. The safe was open and empty, and the computer and telephone lines had been cut. Police found bullet fragments and casings from three different guns.

On the afternoon of July 18, 1999, Raynoha telephoned Torkelson to ask what had happened at Five Star after he had fled with Anderson and Young. Torkelson said that "he did a good job, cried when [police] were questioning him and almost threw up. He said he made it look good." A few days later, Torkelson took newspaper articles about the shootings at Five Star to Raynoha's house and discussed them with him and his girlfriend. Torkelson was "arrogant" and "matter of fact" and wanted to show the articles to Raynoha's girlfriend, but she did not want to see them. Torkelson said things "had gone wrong" and "didn't happen the way they were supposed to," but told Raynoha "not even to trip because [police] weren't looking at [them]." Torkelson showed no signs of remorse.

On July 26 or 27, 1999, Torkelson left San Diego to live with Getscher in Arizona. Torkelson was concerned police would try to hold him responsible for the crimes at Five Star, and he instructed his girlfriend not to talk to police and to "play stupid" if they contacted her.

B.    *Criminal Proceeding*

The People charged Torkelson with murdering Perez and Reynolds (Pen. Code, § 187, subd. (a); subsequent undesignated section references are to this code); attempting to murder Maman (§§ 21a, 187, subd. (a)); and carjacking Gagarin (§ 215, subd. (a)). As to each murder charge, the People alleged as a special circumstance that the murder was committed while Torkelson was engaged in a robbery. (§ 190.2, subd. (a)(17)(A).)

6

A jury found Torkelson guilty on all charges and found the special circumstance allegations true. The trial court sentenced Torkelson to prison for two consecutive terms of life without the possibility of parole for the murders (§ 190.2, subds. (a)(17)(A), (d)), plus concurrent terms of seven years and five years for the attempted murder and carjacking, respectively (§ 664, subd. (a), 215, subd. (b)).

This court affirmed the judgment. (*People v. Torkelson* (Feb. 10, 2011, D055104) [nonpub. opn.].)

C.     *Section 1172.6 Proceeding*

After the judgment against Torkelson became final, the Legislature made significant changes to the law of homicide. Effective January 1, 2019, it narrowed the scope of liability for homicide offenses generally by amending section 188 to add a provision stating: "Malice shall not be imputed to a person based solely on his or her participation in a crime." (*Id.*, subd. (a)(3), added by Stats. 2018, ch. 1015, § 2.) The Legislature also changed the felony-murder rule by amending section 189. (Stats. 2018, ch. 1015, § 3.) If the defendant was not the actual killer and did not aid and abet the killing with intent to kill, the statute as amended requires that the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).) The Legislature created a procedure for defendants who were convicted of murder under the prior, broader felony-murder rule but who could not be convicted under the rule as amended to petition to have the conviction vacated and to be resentenced on any remaining convictions. (Former § 1170.95, added by Stats. 2018, ch. 1015, § 4.) Effective January 1, 2022, the procedure was amended to allow a defendant convicted of attempted murder under the natural and probable consequences doctrine to

7

petition to have the conviction vacated and to be resentenced on any remaining convictions. (Stats. 2021, ch. 551, §§ 1, subd. (a), 2.) Later that year, former section 1170.95 was renumbered as section 1172.6. (Stats. 2022, ch. 58, § 10.)

In reliance on these legislative changes, Torkelson petitioned the trial court to vacate his convictions of murder and attempted murder and to resentence him. The trial court appointed counsel to represent Torkelson and issued an order directing the People to show cause why the relief Torkelson sought should not be granted. (§ 1172.6, subds. (b)(3), (c).) The parties submitted multiple briefs, and the court set the matter for an evidentiary hearing. (*Id.*, subd. (d).)

At the hearing, the trial court admitted into evidence the accusatory pleadings, reporter's trial transcripts, jury instructions, and jury verdicts from Torkelson's criminal proceeding. The only witness was Kristina Mallek, a clinical and forensic psychologist whom Torkelson called to testify about adolescent brain development. Mallek testified adolescence extends from approximately 10 to 21 years of age and brain development continues into the mid-20's. Compared to an adult, an adolescent has a less developed frontal lobe, the part of the brain Mallek said "is responsible for inhibition, executive functioning, putting the brakes on our behavior." According to Mallek, the relative lack of frontal lobe development makes adolescents less likely than adults to anticipate the consequences of their actions and makes adolescents more likely than adults to make poor decisions and to take higher risks whenever they are in the company of their peers or under stress. On cross-examination, Mallek admitted her testimony was about adolescent brain development generally and she had neither interviewed Torkelson nor evaluated his brain development specifically.

8

After Mallek finished testifying, the court heard closing arguments. The deputy district attorney argued Torkelson was not entitled to relief under section 1172.6 on two theories. The first theory was that he was guilty of first degree murder on a felony-murder theory because the evidence showed beyond a reasonable doubt that, based on the various factors identified in case law, he was a major participant who acted with reckless indifference to human life during the robbery of Five Star. The second theory was that Torkelson was guilty of second degree murder because the evidence showed beyond a reasonable doubt that he directly aided and abetted life-endangering acts (armed robbery and assault with a firearm) with implied malice. The deputy district attorney conceded Torkelson could not be convicted of attempted murder after the amendment of section 188. Torkelson's counsel argued the court could not find Torkelson guilty of felony murder because the evidence was insufficient to establish beyond a reasonable doubt that, based on the various factors identified in case law, he was a major participant who acted with reckless indifference to human life in the Five Star robbery. Counsel argued the second degree murder theory urged by the deputy district attorney was legally invalid.

The trial court took a recess and announced its decision. It considered the same factors from case law that the deputy district attorney and Torkelson's counsel discussed in their closing arguments and found beyond a reasonable doubt that Torkelson was guilty of first degree murder as a major participant who acted with reckless indifference to human life in the Five Star robbery. The court acknowledged Torkelson was only 21 years old at the time of the crimes, but found his youth did not reduce his culpability by making him unduly susceptible to influence by his accomplices. Rather, the robbery "was his plan, he put it together, and now he's the one that has to be

9

responsible for it."  The court did not address the theory of second degree murder argued by the deputy district attorney.  It vacated the attempted murder conviction and resentenced Torkelson to prison for two consecutive terms of life without the possibility of parole on the murder convictions and a concurrent term of three years on the carjacking conviction.

II.

DISCUSSION

Torkelson attacks the trial court's decision to deny relief under section 1172.6 on the felony murder convictions based on its findings that he was a major participant who acted with reckless indifference to human life in the Five Star robbery.  His primary argument is that substantial evidence does not support the court's finding that he acted with reckless indifference to human life, because there was no evidence he knowingly created a serious risk of death through his own actions.  With no additional analysis, Torkelson argues that "[t]he same evidence that renders the court's reckless indifference finding unsupportable also negates the court's major participation finding."  He asks us to reverse the order to the extent it refused to vacate the murder convictions and to remand the matter to the trial court with directions to vacate the murder convictions and to resentence him on the underlying robbery.

A.    *Standard of Review*

The substantial evidence standard of review applies when an appellant attacks the factual basis for an order refusing to vacate a murder conviction after an evidentiary hearing under section 1172.6.  (*People v. Emanuel* (2025) 17 Cal.5th 867, 885 (*Emanuel*).)  We review the record in the light most favorable to the order to determine whether the record contains substantial evidence (i.e., evidence that is reasonable, credible, and of solid value) from

10

which the trial court could have found beyond a reasonable doubt that the defendant was guilty of murder under a theory that is legally valid after the changes to sections 188 and 189. (*Emanuel*, at p. 885; *People v. Didyavong* (2023) 90 Cal.App.5th 85, 97.) We presume in support of the order every fact the trial court reasonably could have deduced from the evidence and must accept inferences the court reasonably might have drawn from circumstantial evidence. (*People v. Edwards* (2013) 57 Cal.4th 658, 715; *People v. Montanez* (2023) 91 Cal.App.5th 245, 271 (*Montanez*).) We do not reweigh the evidence and will not reverse the order unless under no hypothesis is there sufficient evidence to sustain the court's factual findings. (*People v. Thomas* (2023) 14 Cal.5th 327, 378; *People v. Cody* (2023) 92 Cal.App.5th 87, 112–113.)

B.     *Torkelson's Liability for Felony Murder Under Current Law*

As we noted earlier, after Torkelson was convicted of felony murder the Legislature narrowed the scope of liability for that offense. To be liable under current law for a death that occurred during the commission of a felony, a person like Torkelson who neither actually killed the victim nor acted with intent to kill must have been "a major participant in the underlying felony" who "acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).) Section 190.2, subdivision (d) subjects to death or imprisonment for life without the possibility of parole a person "who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a [robbery or other] felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor." When the Legislature amended section 189 to refer to section 190.2, subdivision (d), it codified the understanding of the major participation

11

and reckless indifference elements set out in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). (*People v. Strong* (2022) 13 Cal.5th 698, 710.) Therefore, like the parties and the trial court, we review the record in this case under the legal principles established by *Banks* and *Clark* to determine whether it contains substantial evidence that Torkelson was a major participant who acted with reckless indifference to human life in the Five Star robbery.

       1.     *Major participant*

We first consider the evidence bearing on whether Torkelson was a "major participant" in the Five Star robbery. (§ 189, subd. (e)(3).) This element focuses on "the defendant's *personal* role in the crimes leading to the victim's death." (*Banks, supra*, 61 Cal.4th at p. 801.) To qualify as a major participant, the "defendant must have been actively and substantially involved in the events leading up to [the] murder." (*Ibid.*) His "personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Id.* at p. 802.) To determine whether a defendant was a major participant in a felony that resulted in a death, the *Banks* court identified five factors for the trier of fact to consider. (*Id.* at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citation]." (*Ibid.*) As we discuss below, most of the *Banks* factors support the trial court's finding that Torkelson was a major participant in the robbery.

First, "[w]hat role did the defendant have in planning the criminal enterprise that led to one or more deaths?" (*Banks, supra*, 61 Cal.4th at

p. 803.)  Torkelson "concedes that he was the primary planner of the robbery."  The evidence introduced at his trial justifies the concession. Torkelson recruited Anderson, Raynoha, and Young to rob Five Star.  He met with them, drew a diagram of the parking lot, and discussed in detail how the robbery would proceed and the role each participant would play.  The four then drove past Five Star to view the layout and to plan their escape route. Torkelson provided the nylon stockings the others wore over their heads during the robbery.  As the trial court noted, the murders would not have occurred "but for [Torkelson's] meticulous, calculated planning of the robbery."  Of course, as Torkelson points out, the mere fact he " 'started the chain of events' that endangered [the victims'] li[ves], i.e., the robbery," does not make him guilty of felony murder under current law.  (*Emanuel, supra*, 17 Cal.5th at p. 896.)  But his status as the "ringleader" of the Five Star robbery weighs in favor of a finding he was a major participant.  (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.)

Second, "[w]hat role did the defendant have in supplying or using lethal weapons?"  (*Banks, supra*, 61 Cal.4th at p. 803.)  Torkelson himself neither used a gun or other weapon during the Five Star robbery nor gave Young and Anderson the guns they used to kill Perez and Reynolds.  The evidence at trial, however, showed Torkelson had an indirect role in supplying the guns. His plan for the robbery called for Anderson, Raynoha, and Young to be armed.  Torkelson recruited Anderson, who gave one loaded handgun each to Raynoha and Young and kept two for himself.  On balance, this factor is neutral on the issue of major participation.

Third, "[w]hat awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?"  (*Banks, supra*, 61 Cal.4th at p. 803.)  As the

13

mastermind of the Five Star robbery, Torkelson had great awareness of the dangers involved. In accordance with the plan, he drove to Five Star dressed as a security guard to cover the midnight shift and smuggled three convicts armed with loaded guns onto the premises. Torkelson knew the security cameras were not operational, and he told the security guard finishing up the prior shift and the one coming on for the midnight shift to go home. Once the shuttle driver left for the airport, Torkelson continued with the plan by signaling Anderson, Raynoha, and Young to exit the SUV and to start the robbery. The plan was for them to use loaded guns and duct tape to subdue the cashier booth attendant and the night manager, to cut the telephone lines in the office trailer to prevent the victims from summoning assistance, and to steal the money in the booth cash register and the office safe. When Bowman tried to alert Torkelson via radio that something was wrong, Torkelson did not respond. On these facts, the trial court aptly noted Torkelson "clearly knew the danger associated with taking three armed convicts into a [parking lot] devoid of any security, security that he had eliminated, with innocent victims then at their mercy." Torkelson's awareness of the dangers this particular robbery posed supports a finding he was a major participant.

Fourth, "[w]as the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?" (*Banks, supra*, 61 Cal.4th at p. 803.) When Young and Anderson fatally shot Perez and Reynolds inside the office trailer, Torkelson was not there with them. In accordance with the robbery plan, he had gone to a remote part of the Five Star parking lot and pretended to take inventory of the vehicles. "In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death." (*Id.* at p. 803, fn. 5.) Those

14

who are not present at the scene of an unplanned shooting obviously do not themselves cause death by shooting the victims or by directly aiding the actual shooter, and they have no opportunity to prevent death by hindering the actual shooter or helping the victims. (*Ibid.*)

This case, however, is not a typical case in which an accomplice's absence from the scene of a killing during a robbery weighs against a finding of major participation. Torkelson was not in a place from which he could do nothing to prevent the killings because he was, for example, sitting in the getaway car somewhere off the Five Star premises or waiting at home or some other location for his accomplices to return with the loot. (See, e.g., *Banks, supra*, 61 Cal.4th at p. 805; *In re Miller* (2017) 14 Cal.App.5th 960, 965, 974.) He was on the Five Star premises and had a radio by which he could have communicated with Anderson at all times during the robbery. It was by design that Torkelson was not with or near Anderson and Young when they shot the victims in the trailer. The robbery plan called for Torkelson to pretend to be the on-duty security guard and to go "the farthest away from the trailer so that he didn't see anything." This indicates, as the trial court reasonably inferred, that he was intentionally "putting him[self] out of the area when the robbery [took] place" so that he could not intervene and would have "plausible deniability" of involvement in the robbery. On the specific facts of this case, we consider Torkelson's absence from the murder scene to support a finding he was a major participant in the robbery.

Fifth, "[w]hat did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803.) After Anderson and Young fatally shot Reynolds and Perez and fled from Five Star with Raynoha, Torkelson ran to the trailer, discovered the corpses, and reported his findings to Bowman, who relayed them to the 911 dispatcher. When police arrived, Torkelson "did a

15

good job, cried when they were questioning him and almost threw up. He . . . made it look good." Torkelson had to improvise after the unplanned murders, but he stuck to the robbery plan and continued to act as the on-duty security guard to throw off suspicion the robbery was an inside job. He later instructed his girlfriend to "play stupid" if police questioned her about the crimes at Five Star and moved to Arizona with his share of the stolen money. Torkelson's post-shooting conduct weighs in favor of a major participation finding. (See *In re Harper* (2022) 76 Cal.App.5th 450, 462–463 [defendant's continuing with robbery, sharing spoils, and fleeing state after accomplice killed victim supported major participation finding].)

2.  *Reckless indifference to human life*

We next consider whether substantial evidence showed Torkelson "acted with reckless indifference to human life" in the Five Star robbery. (§ 189, subd. (e)(3).) This element focuses on whether the defendant " 'knowingly engag[ed] in criminal activities known to carry a grave risk of death.' " (*Clark, supra*, 63 Cal.4th at p. 616.) The defendant must consciously disregard the substantial and unjustifiable risk of death his actions create. (*Id.* at p. 617; *Banks, supra*, 61 Cal.4th at p. 801.) To determine whether a defendant acted with reckless indifference to human life in a felony that resulted in a death, the *Clark* court identified five factors for the trier of fact to consider. (*Id.* at pp. 618–621.) The *Clark* factors " 'significantly overlap' " the *Banks* factors, and as with the *Banks* factors, " 'no one of [the *Clark*] considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at pp. 615, 618.) We analyze each of the *Clark* factors below and conclude that, when considered as a whole, they support the trial court's finding on reckless indifference.

First, did the defendant use, or know others would use, a weapon during the felony, and if so, how many weapons were used?  (*Clark, supra*, 63 Cal.4th at p. 618.)  Torkelson did not use a gun during the Five Star robbery, but his plan called for his accomplices to use them.  Anderson, Raynoha, and Young each had a loaded gun when Torkelson smuggled them onto the Five Star parking lot in the SUV.  Raynoha used his gun to subdue Bowman and to order Perez to enter the office trailer.  Anderson and Young used their guns to kill Perez and Reynolds, and Raynoha joined them in shooting at Maman as they fled from Five Star.  "Everyone knows the main purpose of a loaded gun is to hurt people."  (*People v. Douglas* (2020) 56 Cal.App.5th 1, 10 (*Douglas*).)  Of course, as Torkelson argues, "*The mere fact* of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life."  (*Clark*, at p. 618, italics added; see *Banks, supra*, 61 Cal.4th at p. 805 ["participation in an armed robbery, *without more*, does not involve 'engaging in criminal activities known to carry a grave risk of death' " (italics added)]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987 (*Ramirez*) ["The use of a gun in the commission of the underlying felony *standing alone* is not sufficient to support a finding of reckless indifference" (italics added)].)  Torkelson's knowledge his three accomplices would each use a loaded gun in the robbery may not alone be dispositive, but it supports a reckless indifference finding. (*In re Parrish* (2020) 58 Cal.App.5th 539, 544 (*Parrish*); *Douglas*, at p. 10; *In re McDowell* (2020) 55 Cal.App.5th 999, 1013 (*McDowell*).)

Second, was the defendant physically present at the crime scene, and did he have opportunities to restrain accomplices or to aid victims?  (*Clark, supra*, 63 Cal.4th at p. 619.)  This factor is substantially similar to the fourth *Banks* factor we discussed above.  As we noted there, Torkelson was in a

remote part of the Five Star parking lot when Anderson and Young fatally shot Reynolds and Perez in the office trailer. Torkelson points out that several courts have held a defendant's location that prevents observation of accomplices' interactions with victims, restraint of accomplices' actions, or aid of victims weighs against a finding the defendant acted with reckless indifference to human life. (See, e.g., *In re Scoggins* (2020) 9 Cal.5th 678–679 (*Scoggins*); *In re Moore* (2021) 68 Cal.App.5th 434, 452 (*Moore*); *Ramirez, supra*, 71 Cal.App.5th at p. 989; *In re Taylor* (2019) 34 Cal.App.5th 543, 559 (*Taylor*).) But "physical presence [at the scene of the killing] is not invariably a prerequisite to demonstrating reckless indifference to human life." (*Clark*, at p. 619.) Torkelson deliberately distanced himself from the office trailer, where Anderson and Young were supposed to steal the money from Reynolds and ended up killing him and Perez, so that his failure to intervene would not arouse suspicion he was involved in the robbery. But Torkelson was not completely out of touch with his accomplices during the crimes. He radioed Anderson to start the robbery and could have used the radios to communicate with him while he was in the trailer. Although Torkelson was not at the scene of the murders with an opportunity to prevent them, under the specific facts of this case his purposeful absence does not weigh against a finding of reckless indifference. (See *Emanuel, supra*, 17 Cal.5th at p. 891 [intentional inaction may indicate reckless indifference to human life]; *Scoggins*, at p. 679 [defendant who plans and directs crime from afar may be as culpable as accomplice present at crime scene].)

The second *Clark* factor also includes consideration of "[a] defendant's actions after the shooting," which "may bear on the defendant's mental state." (*Scoggins, supra*, 9 Cal.5th at p. 679.) Failure to aid the victims, which the trial court mentioned, may indicate reckless indifference to human life.

18

(*Ibid.*) Such inaction has little significance in this case, however. By the time Torkelson got to the office trailer, Perez and Reynolds were already dead and Bowman had already called 911. (See *McDowell, supra*, 55 Cal.App.5th at p. 1014 [defendant's failure to aid victim was neutral when others summoned aid].) Other post-shooting conduct the trial court mentioned— putting on a show for police by crying and retching, bragging and sharing newspaper articles about the shootings with Raynoha and his girlfriend, and failing to show remorse—is ambiguous as to Torkelson's state of mind. The conduct may indicate he "had anticipated the use of lethal force and thus was not entirely shocked by the deadly turn of events." (*Scoggins*, at p. 680.) Alternatively, the show Torkelson put on for police may indicate an intent to deflect suspicion and to avoid arrest. (See *Emanuel, supra*, 17 Cal.5th at p. 894; *Scoggins*, at pp. 679–680.) The bragging and lack of remorse may reflect no more than callous indifference to the fact that Perez and Reynolds had been killed, which Torkelson correctly asserts "is insufficient, standing alone, to support murder liability." (*Emanuel*, at p. 895; see *Taylor, supra*, 34 Cal.App.5th at p. 560.) The conduct the trial court identified is consistent with Torkelson having had a culpable mental state at the time of the shootings, but his "actions after the shooting do not weigh substantially in favor of a finding of reckless indifference to human life." (*Scoggins*, at p. 680.)

Third, what was the duration of the felony? (*Clark, supra*, 63 Cal.4th at p. 620.) The trial court did not mention this factor. The exact duration of the robbery is not clear from the record, but it seems to have been between 15 and 20 minutes. Torkelson describes this period as "brief" and contends courts have held similar periods were not long enough to support a reckless indifference finding. (See, e.g., *Scoggins, supra*, 9 Cal.5th at p. 681 [robbery

lasted at most 5 minutes]; *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 127 (*Guiffreda*) [robbery lasted less than 10 minutes].) The reckless indifference inquiry, however, is not concerned merely with the number of minutes it took to complete the felony. What matters is whether the interaction between perpetrators and victims was long enough to create " 'a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, at p. 620.)

The Five Star robbery lasted long enough to present an increased opportunity for lethal violence. For at least 15 minutes, Raynoha used a loaded gun to subdue Bowman in the cashier booth and stole the money from the cash register. During that same time, Young and Anderson used their loaded guns to restrain Perez and Reynolds inside the office trailer, cut the telephone and computer lines, and stole the money from the safe. Though not "prolonged" (*Clark, supra*, 63 Cal.4th at p. 620), the robbery was neither "a purely spontaneous crime of opportunity" in which "events occurred rapidly within a short timeframe" (*Giuffreda, supra*, 87 Cal.App.5th at p. 128) nor an "unexpected and unplanned" encounter in which "events unfurled in rapid succession once the encounter began" (*People v. Keel* (2022) 84 Cal.App.5th 546, 560 (*Keel*)), such as would weigh against a reckless indifference finding. Nevertheless, it appears the amount of time it took to complete the robbery "did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Emanuel, supra*, 17 Cal.5th at p. 886.) "The *Clark* factor concerning duration of the crime therefore is neutral in this case[.]" (*Ibid.*)

Fourth, what was the defendant's knowledge of the likelihood that accomplices would kill? (*Clark, supra*, 63 Cal.4th at p. 621.) The trial court recognized this issue was "a difficult one." The court stated Torkelson knew his accomplices: (1) "had all served time"; (2) "shared political beliefs similar

20

to his, both through Aryan Brotherhood and Aryan Nation, clearly, knowing that violent acts would be done as part of one's allegiance to the association"; and (3) "were armed with loaded firearms" such that "at a minimum there was going to be an assault on [the Five Star] employees." Torkelson contends the facts the court identified do not constitute substantial evidence that he knew Anderson and Young were likely to kill. We agree.

The record contains evidence from which the trial court reasonably could infer Torkelson knew his accomplices had all committed crimes and served time in confinement. He had spent time in juvenile hall with Raynoha, who was there for stealing a car, breaking into a residence, and possessing drugs and a dagger. Torkelson was a friend of Young, who had served time in prison with Anderson; and while the three were living with Getscher in Arizona, Torkelson and Young attempted to cash checks Anderson had stolen, and Torkelson broached the topic of robbing Five Star. But "no evidence was introduced that [Torkelson's accomplices] "had themselves previously committed murder, attempted murder, or any other violent crime." (*Banks, supra*, 61 Cal.4th at p. 805.) The evidence about their affiliations with Aryan Nation was minimal and did not suggest any of them was likely to kill. There was testimony Torkelson, Raynoha, and Young had attended Aryan Nation functions, but none that Anderson had. No evidence was introduced that a person who attends Aryan Nation functions is likely to commit lethal violence or, as the trial court suggested, that Young and Anderson fatally shot Perez and Reynolds out of "allegiance" to Aryan Nation. Torkelson's awareness his accomplices were armed with guns they would use to assault the victims does not equate to knowledge they were likely to kill the victims, especially since he could not observe any actions of the accomplices just before the shootings that might have indicated such a

21

likelihood. (*Clark, supra*, 63 Cal.4th at p. 621; *Banks*, at p. 809; *Taylor, supra*, 34 Cal.App.5th at p. 559.) "This factor thus does not increase [Torkelson's] culpability." (*Clark*, at p. 621.)

Fifth, what efforts did the defendant take to minimize the risks of violence during the felony? (*Clark, supra*, 63 Cal.4th at p. 621.) Torkelson argues he reduced the risk by planning the robbery for late at night when few, if any, travelers would be arriving at Five Star to park their vehicles and only two employees, unarmed and trained not to resist robbers, would be on duty. Planning to rob a business when few employees or customers will be there may be an effort to minimize the risk of violence. (See *ibid.* ["attempted robbery was undertaken after closing time, when most of the employees had left the building"].) But the trial court "didn't interpret it that way," and found Torkelson selected the time of the robbery "to minimize the risk of detection" and "to facilitate the robbery." Timing a robbery for when business is slow may minimize not only the risks of violence by reducing the number of potential victims but also the risks of detection and frustration by reducing the number of potential witnesses and potential interveners who might thwart the crime. (Cf. *Emanuel, supra*, 17 Cal.5th at p. 887 [risk of violence was reduced for robbery planned for 2:30 p.m. in public park where witnesses might be present to observe crime]; *Scoggins, supra*, 9 Cal.5th at p. 683 [same for robbery planned for public parking lot during daytime when possible presence of witnesses might make accomplices stick to plan].) Where, as here, competing inferences reasonably can be drawn from the timing of the robbery, we must accept the inference the trial court drew. (*People v. Flores* (2020) 9 Cal.5th 371, 411; *McDowell, supra*, 55 Cal.App.5th at pp. 1013–1014.)

Other elements of Torkelson's plan indicate his concern was not minimizing the risks of violence but minimizing the risks of detection and frustration of the robbery. Torkelson supplied nylon stockings for his accomplices to disguise their faces. He knew the security cameras at Five Star were not operational and ensured there was no real security guard on the premises by sending the guard who was supposed to be on duty home and pretending to take his place. Torkelson instructed Anderson and Young to cut the telephone lines in the office trailer and to bind the night manager with duct tape to prevent him from reporting the robbery and summoning assistance. The plan called for the placement of a loaded gun into the hands of each of three known criminals, who could use the guns to neutralize any resistance a victim or interloper might offer. This is in marked contrast to cases where the fifth *Clark* factor did not support a finding the defendant acted with reckless indifference to human life because the robbery plan did not include use of weapons (*Emanuel, supra*, 17 Cal.5th at p. 887; *Scoggins, supra*, 9 Cal.5th at p. 683) or called for use of an unloaded gun (*Clark, supra*, 63 Cal.4th at pp. 621–622). The elements of the plan, when considered together, "elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623; see *Parrish, supra*, 58 Cal.App.5th at p. 544 [defendant "knew the robbery plan involved firearms," but "did not ensure the guns were unloaded"]; *McDowell, supra*, 55 Cal.App.5th at p. 1014 [defendant's "plan for the robbery posed obvious risks of lethal violence, and he made no attempt to lessen the risks"].) This factor supports a reckless indifference finding.

In addition to the *Clark* factors, courts have identified a defendant's youth as a consideration relevant to determining whether he acted with reckless indifference to human life in the commission of a felony that resulted

23

in a death. (E.g., *Keel, supra*, 84 Cal.App.5th at pp. 558–559; *Ramirez, supra*, 71 Cal.App.5th at p. 987; *Moore, supra*, 68 Cal.App.5th at p. 454.) A youthful defendant's lack of the experience, perspective, and judgment that are needed to appreciate the risk of death associated with criminal activity may lessen his culpability. (*Moore*, at p. 454.) Assessment of a youthful defendant's culpability requires consideration of his background and mental and emotional development. (*Ramirez*, at p. 987.)

At the evidentiary hearing on the section 1172.6 petition, the trial court heard testimony about adolescent brain development from Mallek, a clinical and forensic psychologist. Mallek testified adolescents (i.e., persons 10 to 21 years old) do not have fully developed brains and, when compared to adults with fully developed brains, are less likely to anticipate the consequences of their actions and more likely to make poor decisions and to engage in high-risk behavior when they are in the company of their peers or under stress. Relying on Mallek's testimony, Torkelson's counsel argued Torkelson did not act with reckless indifference to human life in the robbery because he had "a pronounced susceptibility to peer influence" due to his age and the robbery was planned "in a typical peer influence setting" where "anticipation of reward way overpower[ed] perception of risks." The court rejected this argument. The court noted that around the time of the Five Star robbery, Torkelson was 21 years old, had a job, and was living with his girlfriend. The court also noted he planned the robbery and recruited the accomplices, and at trial "there was overwhelming evidence to suggest that he was not in any way influenced by others in promoting the robbery."

Torkelson contends the trial court "appears to have not fully appreciated the impact of [his] youth on his mental state." Citing Mallek's testimony and legal authorities acknowledging that incomplete brain

24

development of young adults may reduce their culpability, Torkelson argues the court did not consider how his underdeveloped brain might have affected his ability to recognize the risks of the Five Star robbery or caused him to discount the consequences of his actions in the presence of peers. According to Torkelson, "If afforded the necessary weight in the required totality of the circumstances analysis, consideration of [his] youth at the time of the crimes further emphasizes that substantial evidence does not support the court's reckless indifference finding." We disagree.

The cases discussing the differences in brain development between youthful offenders and their elder counterparts that make youthful offenders less culpable "stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.) The record contains no evidence that either factor contributed to Torkelson's criminal behavior. This was not "a situation where a youthful offender was swept up in circumstances beyond his or her control that led to an unintended death." (*Ibid.*) Torkelson planned the Five Star robbery in detail over the course of several days, assigned the roles he and each of his accomplices would play, and actively participated in the robbery from start to finish. He points to no evidence that any of his accomplices pressured him into doing so. Nor does Torkelson identify "*any* specific support for the proposition that his level of maturity somehow lessened his culpability for th[ese] murder[s]." (*Id.* at p. 490.) Torkelson identifies nothing in his background or mental and emotional development, such as early gang involvement, childhood trauma, or mental illness, that might lessen his culpability. (See, e.g., *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091; *Keel, supra*, 84 Cal.App.5th at p. 562.) Mallek did not interview Torkelson, did not know whether any type of abuse or trauma had affected

25

his brain development and functioning, and offered no opinion on his psychological characteristics. On this record, Torkelson's young age at the time of the crimes did not weigh against a finding he acted with reckless indifference to human life.

### 3.    *Conclusion*

The trial court conducted the required " 'fact-intensive, individualized inquiry' into where [Torkelson's] conduct falls on the spectrum of culpability" (*Emanuel, supra*, 17 Cal.5th at p. 883) and found him guilty of murder as a "major participant" who "acted with reckless indifference to human life" in the Five Star robbery (§ 189, subd. (e)(3)). In reviewing that finding for substantial evidence, we conclude that not every relevant factor supports the finding when considered separately, but the "totality of the circumstances" does. (*Scoggins, supra*, 9 Cal.5th at p. 677; *Banks, supra*, 61 Cal.4th at p. 802.) The record shows Torkelson was no minor participant in " 'a garden variety armed robbery,' " i.e., one "in which the only factor supporting reckless indifference to human life is the fact of the use of a gun." (*Clark, supra*, 63 Cal.4th at p. 617, fn. 74.) The record contains substantial evidence that Torkelson planned and led a robbery in which he smuggled three known criminals with loaded guns onto premises he took steps to make unsecure; the accomplices used the guns to subdue and to steal money from the victims; and after two of the accomplices shot two of the victims dead, he continued with the robbery plan and showed no signs of surprise or remorse. On this record the legislative changes to the felony-murder rule that took effect after Torkelson was convicted do not relieve him of liability for the murders, and the trial court did not err in refusing to vacate the murder convictions. (§ 1172.6, subd. (a)(3); *People v. Hill* (2024) 100 Cal.App.5th 1055, 1076; *Douglas, supra*, 55 Cal.App.5th at p. 11.)

26

## III.

## DISPOSITION

The order granting in part and denying in part the petition for relief under section 1172.6 is affirmed.


                                                                IRION, J.

WE CONCUR:



McCONNELL, P. J.



BUCHANAN, J.